[No. 2632 July 2, 1925.]

[Rehearing Denied Dec. 12, 1925.]

STATE ex rel. OTTO v. FIELD (now BACA)

State Commissioner of Public Lands.

[241 Pac. 1027]

### SYLLABUS BY THE COURT.

1.  Findings of fact relative to alleged classifications as nonmineral lands certain public lands contracted to be sold to appellee examined, and it is held, that such findings are not supported by substantial evidence.

2.  The commissioner of public lands, being clothed with the power to select, locate, classify, and have the directtion, control, care, and disposition of all public lands under the provisions of the act of Congress relating thereto, and such regulations as might be provided by law, and his jurisdiction over the land extending to all cases except as otherwise specifically provided by law, had the power to reserve the minerals in the land to the fund or institution to which the land belongs, when making sale thereof.

3.  Where the notice of the public sale of state lands contains the provision that the successful bidder shall execute a contract within 30 days after it is mailed to him, said contract to provide, among other things, the conditions, obligations, reservations and terms as may be required by law, and such contract, containing the mineral reservation complained of, is afterwards executed, and there is no show-

---

[1] 23CJ p. 78 n. 99; 32Cyc p. 1088 n. 29, p. 1095 n. 8 New, p. 1096 n. 8 New.
[2] 12CJ p. 711 n. 67, p. 719 n. 26; 18CJ p. 1280 n. 81; 35CJ p. 426 n. 13, 16; 32Cyc p. 1090 n. 49 New, p. 1251 n. 21; 34Cyc p 1818 n 60; 36Cyc p. 1113 n. 84; p. 1128 n. 58; p. 1135 n. 14; p 1140 n. 64; p. 1141 n. 70.
[3] 13CJ p. 561 n. 38; 32Cyc p. 1090 n. 49 New, p. 1096 n. 8 New.

State ex rel. Otto v. Field, 31 N. M. 120

ing that appellee was in any manner misled as to the presence of such reservation in the formal contract, the purchaser (appellee) may not successfully claim that the agreement was complete upon the acceptance of his bid and first payment on the purchase price of the land, and that he is not bound by the express terms of the formal contract so executed by him pursuant to the requirements stated in the notice of sale.

Appeal from District Court, Santa Fe County; Holloman, Judge.

Mandamus by the State, on the relation of Christian Otto, against Nels Field (now Justiniano Baca), as Commissioner of Public Lands of the State of New Mexico. From an adverse judgment, defendant appeals. Reversed and remanded, with directions to discharge writ.

H. S. Bowman, Atty. Gen., for appellant.

E. R. Wright, of Santa Fe, and Crampton & Darden, of Raton, for appellee.

### OPINION OF THE COURT

BICKLEY, J. The plantiff, appellee here, filed his petition for an alterative writ of mandamus in the district court of Santa Fe county on the ———— day of October, 1919, where he demanded that the defendant, appellant here, execute to him a deed without any reservation whatsoever for certain state lands which had been applied for by Louis W. Christoph, whose rights were succeeded to by the appellee. The appellant answered, alleging that the said appellee had no right to a deed in the form demanded in the petition for the writ of mandamus, and denying the right of the appellee to the redress demanded.

On the said pleadings, the matter came to a hearing before the district court, which issued the temporary writ, afterwards making it permanent, requiring the appellant to execute the deed in the form demanded in the petition, and entered judgment in accordance with said writ. From this judgment this appeal is prosecuted by the appellant to the Supreme Court of the state.

122       SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

The facts in the main are as follows:

On February 21, 1916, one Louis W. Christoph filed an application in the usual form for the purchase of state lands in Union county, N. M. Thereafter an appraisement was had of the lands, and a written copy of the appraiser's report was duly filed in the office of the commissioner of public lands. The application to purchase was duly approved, and the land advertised for sale in accordance with the provisions of the law. The sale was held pursuant to said notice, and at the sale one Thomas Gray, acting for himself as to part of the lands involved, and for the appellee, Christian Otto, as to a portion of said lands, was the highest and best bidder, and said lands were duly struck off to said Thomas Gray, who was acting as the agent of the appellee as to a portion of said lands. The amount of the bid was $6.05 per acre, or $1,210 for the land purchased by the appellee. Under date of April 25, 1917, the date of the sale, there was executed by the then commissioner of public lands and the appellee herein a written contract No. 1142. Under date of June 25, 1917, the commissioner issued his receipt No. 23785 to the said appellee for the amounts due for the appraisement, advertisement, and first payment upon said lands. The written contract aforesaid contains a reservation to the state of New Mexico of all minerals contained in the lands sold under the contract; the reservation being in the following language:

"That this land is being purchased for the purpose of grazing and agriculture only; that, while the land herein contracted for is believed to be essentially nonmineral land, should minerals be discovered therein, it is expressly understood and agreed that this contract is based upon the express conditions that the minerals therein shall be and are reserved to the fund or institution to which the land belongs, together with the right of way to the commissioner, or any one acting under his authority, to at any and all times enter upon said land and mine and remove the minerals therefrom without let or hindrance."

On October 12, 1919, the appellee tendered to the appellant, Nels Field, as commissioner of public

JANUARY TERM, 1925                    123

State ex rel. Otto v. Field, 31 N. M. 120

lands, the sum of $1,054.23, being the unpaid· balance due, including the principal and interest, upon the purchase price of the said lands purchased by the appellee herein, and demanded of the appellant as said commissioner that he issue and deliver to the said appellee a deed to the said lands without any reservation or condition as to the minerals contained in the lands. The appellant refused to issue and deliver such deed, upon the ground that the appellee was entitled only to such deed as was contemplated by the contract of sale between the said parties, but agreed to issue and deliver a deed containing a reservation of said minerals as provided for in the said contract of sale. The appellee then filed his suit in mandamus in the district court in the county of Santa Fe to compel the commissioner to issue the said deed without reservation in accordance with his demand therefor. Testimony was submitted, and, after considering the same, the court made certain findings of fact and conclusions of law and rendered judgment, making the alternative writ peremptory, and granting to the appellee the relief prayed for in his petition for the said writ.

It is claimed by the appellant that this proceeding is in effect a suit against the state of New Mexico. and that as such it cannot be maintained. This is a very vital question, and if the appellant is right on this contention, the case is disposed of on the authority of State ex rel. Evans v. Field, Commissioner of Public Lands et al., 27 N. M. 384, 201 P. 1059. It will be necessary to consider more or less the merits of the controversy in order to determine whether or not this is in effect a suit against the state. As was said in State ex rel. Evans v. Field, supra:

"Where the contract is between the individual and the state, any action founded upon it against defendants who are officers of the state, the object of which is to enforce the specific performance by compelling those things to be done by the defendants which, when done, would constitute a performance by the state, or to forbid the doing of those things which, if done, would be simply breeches of the contract of the state, is in substance a

124        SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

suit against the state itself, and within the prohibition of the Constitution. * * * On the other hand, where the law directs or commands a state officer to perform an act under given circumstances, which performance is a mere ministerial act, not involving discretion, mandamus will lie to compel the action, notwithstanding performance of the state's contract may incidentally result. In such a case the action is not really upon the contract, but is a against the officer as a wrongdoer. He is, under such circumstances, not only violating the rights of the relator, but is disobeying the express commands of his principal, the state."

Supplementing the statement of the foregoing principle, attention is called to other similar expressions by our court. In the case of State v. Marron, 18 N. M. 426, 137 P. 845, 50 L. R. A. (N. S.) 274, in discussing a question of discretionary action on the part of the state treasurer, the court said:

"If the state treasurer has the discretion hereinbefore mentioned, he is not, of course, subject absolutely to mandamus to make any particular form of investment of these funds."

In the same case, in a concurring opinion, Chief Justice Roberts said:

"Before mandamus will lie, it must be determined that the investment of school moneys by the state treasurer requires the exercise of no judgment or discretion on his part. The only acts to which the power of the courts by mandamus extends are such as are purely ministerial and with regard to which nothing like judgment or discretion in the performance of his duties is left to the officer but that wherever the right of judgment or decision exists in him it is he and not the courts who can regulate its exercise."

So it will be important to consider the powers and duties of the commissioner of public lands under the Enabling Act, the Constitution of New Mexico, and the legislative enactments of the state, as aided by such rules of statutory construction as may be proper to be applied thereto, in order to arrive at a conclusion as to whether the duties of the appellant in connection with the subject-matter of this case were purely ministerial, or whether anything like judgment or discretion entered into the performance of such duties.

State ex rel. Otto v. Field, 31 N. M. 120

Under an act to enable the people of New Mexico to form a Constitution and state government, commonly called the Enabling Act, certain public lands belonging to the government were granted to the state of New Mexico for certain public purposes, chiefly for educational purposes and for the maintenance of educational institutions, including free public schools. Section 10 of the said Enabling Act is the only one to which our attention has been called, which attempts in any way to regulate or control the disposition of the lands. Portions of said section 10 are as follows:

"Sec. 10. That it is hereby declared that all lands hereby granted, including those which, having been heretofore granted to the said territory, are hereby expressly transferred and confirmed to the said state, shall be by the said state held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same.

"Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any object other than that for which such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this act, shall be deemed a breach of trust.

"No mortgage or other incumbrance of the said lands, or any thereof, shall be valid in favor of any person or for any purpose or under any circumstances whatsoever. Said lands shall not be sold or leased, in whole or in part, except to the highest and best bidder at a public auction to be held at the county seat of a county wherein the lands to be affected, or the major portion thereof, shall lie, notice of which public auction shall first have been duly given by advertisement, which shall set forth the nature, time, and place of the transaction to be had, with a full descripton of the lands to be offered, and be published once each week for not less than ten successive weeks in a newspaper of general circulation published regularly at the state capital, and in that newspaper of like circulation which shall be regularly published nearest to the location of such lands so offered; nor shall any sale or contract for the sale of any timber or other natural product of such lands be made, save at the place, in the manner, and after the notice by publication thus provided for sales and leases of the lands themselves: Provided, that nothing herein contained shall prevent said proposed state

126    SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

from leasing any of said lands referred to in this section for a term of five years or less without said advertisement herein required.

"All lands, leaseholds, timber, and other products of land before being offered shall be appraised at their true value, and no sale or other disposal thereof shall be made for a consideration less than the value so ascertained, nor in any case less than the minimum price hereinafter fixed, nor upon credit unless accompanied by ample security, and the legal title shall not be deemed to have passed until the consideration shall have been paid. * * *

"Every sale, lease, conveyance, or contract of or concerning any of the lands hereby granted or confirmed, or the use thereof or the natural products thereof, not made in substantial conformity with the provisions of this act shall be null and void, any provision of the Constitution or laws of the said state to the contrary notwithstanding.

"It shall be the duty of the Attorney General of the United States to prosecute in the name of the United States and its courts such proceedings at law or in equity as may from time to time be necessary and appropriate to enforce the provisions hereof relative to the application and disposition of the said lands and the products thereof and the funds derived therefrom."      ,

Constitutional and statutory provisions having a bearing on the controversy will be noted during the course of the discussion.

This case is of great importance, not only to the litigant who seeks protection of the right he claims, but also it is of great public interest. because there is involved the policy and interest of the state as a trustee with respect to its school fund. Counsel have ably presented the respective contentions of the parties, and have shown great diligence in research among the adjudicated cases. Realizing the importance of the matter, we have considered all of the authorities cited, and have ourselves made independent research, and have given much careful consideration to the matter in · order to arrive at a proper and just conclusion.

The appellant claims that the written contract between appellee and appellant's predecessor in office constitutes the controlling agreement between the parties. If appellant is correct in this conten-

tion, then the case is controlled by the decision of this court in State ex rel. Evans v Field, supra, and the judgment of the court below must be reversed.

Appellee says that his right to purchase the land free of reservation does not arise from the written contract but from another and prior one, which is implied from the preliminary occurrences leading up to the execution of the written contract. Appellee advances many arguments to sustain this proposition, and we consider in this opinion such of them as seem to warrant our consideration.

It is conceded by appellee, and in fact urged, that the lands in controversy were state lands under the jurisdiction of the commissioner of public lands. It is urged that the reservation contained in the formal contract is wholly void, and therefore not binding on appellee and that he is not estopped to assert the invalidity of such reservation, and it is said the commissioner is expressly prohibited by our statute from selling mineral lands, and that it was the duty of the commissioner, prior to offering the land for sale, to classify the state lands and to pass upon the application of appellee for the purchase of land and determine whether or not the land involved was subject to sale.

Truly, it was the constitutional duty of the land commissioner to classify the public land, but no specific limitation of time is stated as to when the classification should be made. It is admitted that, prior to the giving of notice of the sale, the lands involved had been duly selected and located under the direction and with the approval of the Secretary of the Interior of the United States from the surveyed, unreserved, unappropriated, and nonmineral public lands of the United States by the then commissioner of public lands of New Mexico. It is not shown how large an acreage had been selected at that time nor upon what date. It appears from the records of the land office, of which we take notice, that the land in question was applied for by appellee before it was "clear listed" to the state. It may be

128    SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

assumed that the government of the United States did not, at the time of the selection, regard the land selected as mineral lands. We may also assume that to properly classify the lands granted to the new state would require a great expenditure of time and labor and funds by an organization to be formed under the guidance and direction of the commissioner of public lands. What had been done in that direction up to the time of the sale is not shown, and it may be that the caution with which the commissioner proceeded with respect to instructions as to appellant's form of application, warning clauses in advertisements of sale and reservations in contracts, had its origin in the fact that the commissioner had no satisfactory data upon which to make a classification.

[1, 4] It is next claimed by the appellee that the commissioner had virtually classified the lands involved as nonmineral in character prior to offering the same for sale. It was so alleged in the petition, and this allegation was practically the only allegation of the plaintiff's petition which the defendant denied. The court below found that the lands were classified as nonmineral in character at the time of the application to purchase the same was made. The action of the court in so finding was duly excepted to by the defendant, and is one of the errors assigned by appellant. We do not think this finding of the court was sustained by any substantial evidence. In fact, we do not find that appellee contends that there was any evidence to support such finding. We find it argued in their brief that a constitutional duty was imposed upon the commissioner to classify the lands, and that it is a legal presumption that he had performed that duty prior to the date of the application. But appellee put in evidence "Administrative Ruling No. 1, 1919," which declares in part as follows:

"Whereas, it has come to the knowledge of the commissioner of public lands of the state of New Mexico that geologists and other scientists have expressed their opinion

JANUARY TERM, 1925                                        129

State ex rel. Otto v. Field, 31 N. M. 120

that a large part of the state of New Mexico is considered to be possible oil and gas bearing lands; and

"Whereas there has been within the past three months unprecedented activity in procuring leases of state lands and lands in private ownership adjacent thereto, within the state of New Mexico, for the purpose of developing the same for oil and gas and ascertaining their possible value for such purposes; and

"Whereas by an act of the Fourth Legislature of the state of New Mexico, approved March 17, 1919, entitled 'An act providing for the leasing of state lands for mineral purposes, and providing for the issuance of limited patents for mineral lands, and for other purposes,' the commissioner of public lands is authorized to classify the lands of the state as mineral lands or otherwise, according to the terms of the said act; and

"Whereas, it is not possible under present conditions to segregate mineral or prospective mineral lands from nonmineral lands of the state, nor to determine with accuracy which lands are to be regarded as mineral lands, or otherwise;

"Now, therefore, for the purpose of orderly administration of the lands of the state of New Mexico, and in order that the state may be afforded maximum protection from the purchase of' lands as nonmineral, which may in fact be mineral lands or subject to classification as such, under the terms of the act aforesaid,

"It is hereby ordered that all of the lands granted by the said state by virtue of the terms of the granting acts of Congress, which have been approved by the Secretary of the Interior, shall be, and the same are hereby, designated, for the purposes of proper, orderly and lawful administration, as mineral lands, and this designation and classification shall apply to lands selected and unapproved as of the date approval of such unapproved selection may be from time to time made by the Secretary of the Interior;

"And it is further ordered that the designation and classification of all lands of the state, as herein provided, as mineral lands, shall be and remain in full force and effect until such time as the commissioner of public lands shall modify or amend this ruling, with respect to all or any portion of the lands of the state of New Mexico."

Capt. Frederick Muller, the then assistant commissioner of public lands, was called as a witness by appellee and testified that on April 4, 1919, the lands in question, pursuant to such administrative ruling, were classified as mineral lands, and it was admitted by appellee that the records of the land

130    SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

office showed that the particular tract of land in controversy in this case was marked with the words, "Classified as mineral lands," and that the particular tract of land in the tract book was designated as mineral land; such designation being made as of April 4th. Witness testified that such was the only classification which had been made of the lands involved since the contract with appellee. It is not shown by any evidence that any other classification had been made prior to the contract, or prior to the date of the application or sale.

We find that chapter 78, Laws 1919, approved March 15th, referred to in the administrative ruling offered in evidence by appellee, declares:

"Section 1. Whereas, the state is the owner of nearly 10,000,000 acres of land, scattered throughout its entire area, and

"Whereas, it is deemed to be in the interests of proper administraton of such lands that detailed informtion with respect to their character and value be available for the purpose of securing to the state a just and fair revenue from rentals and sales of such lands and their products, and

"Whereas, no such detailed data and. information are now in possession of the commissioner of public lands, as are necessary and required by him for the just and proper administration of said lands.

"Sec. 2. Now therefore, the commissioner of public lands is hereby authorized to expend, out of the state lands maintenance fund not to exceed $10,000 per annum, for the purpose of obtaining full and complete data as to the nature, character, quality and value of the lands of the state of New Mexico, and their adaptability for grazing, stock farming and agriculture. And the commissioner of public lands is further authorized to classify the lands of the state as mineral bearing, or otherwise, and to ascertain the possibilities of the state's mineral lands for the development in the production of coal, petroleum or other minerals therein contained.    The commissioner of public lands is further authorized to ascertain what lands of the state contain merchantable timber and procure data with respect to the state's timber lands which will be available for the information of intending or prospective purchasers.

"Sec. 3. For the purpose of carrying into effect the provisions of this act, the commissioner of public lands is authorized to install in his office such a system of maps, plats and tract books as shall, be necessary and convenient for properly recording, in readily accessible form,

such data as he may obtain, pertaining to the character of the state's lands.

"Sec. 4. That it is necessary for the preservation of the public peace, health and safety of the inhabitants of the state of New Mexico, that this act take effect and be in full force and effect from and after its passage and approval."

We think this is a legislative declaration indicating that no classification had been made, and that in fact the commissioner had been without sufficient data to independently make such a classification. Our attention has not been called to any prior statute making so serious a provision for classification of the state lands, or, in fact, any specific provision for classification; it being earlier provided for the inspection, appraisement, and investigation of the lands.

We do not regard the statement in the contract quoted in appellee's brief, "that the land herein contracted for is believed to be especially nonmineral land," as a classification of the land as such by the commissioner. It is a declaration of both parties to the contract, and is a part of the very contract and reservation sought to be voided by appellee. It appears to us to indicate rather that the commissioner had no conviction upon the subject, than otherwise. At most, it was merely a qualified determination.

In the case of Johnson v. Sunshine Oil Corporation (Tex. Civ. App.) 227 S. W. 698, it was held that the report of the appraisers was not evidence of classification of school lands, as affecting permits to prospect for oil and gas, and also that, where the purchaser represented that land was agricultural, etc., the state could not permit another to prospect for oil and gas. The court was called on to consider several propositions, among them the following:

"Second, That it was the private property of the plaintiff, and the state had no authority to grant a permit to anyone except plaintiff.

"Third. That the act authorizing the issuance of permits to strangers to exploit privately owned property is unconstitutional."

The court said:

"The answer to the second and third contention is that the application upon which this award was made to Rawlins contains the following stipulations: 'For the purpose of buying said land, I hereby represent that I am buying it for agricultural or grazing purposes only, and, if it is classed as mineral land, the sale to me is upon the express condition that the minerals thereon shall be and are reserved to the fund to which the land belongs, to all of which I agree.'

"The commissioner's award indorsed upon the back of this application must necessarily mean that to the award was attached this condition.    True, the application is that he applies to buy the land for agricultural and grazing purposes only,' and the notation of the commissioner is 'Class, Graz.' But these things could not be held to be a reclassification. It would seem that since the statute (article 5406) requires the commissioner to 'adopt all necessary forms of applications for sales, etc.,' that we may well presume that this application was prepared by him, and he, as well as the purchaser, was limited to its contents, and a notation on the back that fell short of the provisions upon its face would not limit the latter or be a sale of the land as grazing land without a reservation of the minerals; and the classification noted in the land office and filed in the county where the land is situated as provided by statute serves to reserve the minerals for the school fund, and these records are notice to the purchaser of such reservations.    If the land has been classified and sold without reservations, then the appellant's contentions would be well taken."

In New Mexico, the commissioner, by Code, § 5179, was given power to receive and pass upon all applications for purchasing state lands, and we may presume that such application was prepared by the commissioner.    In the application relied upon, appellee's agent stated under oath that the land was grazing land, that there was no mineral, coal, oil, or gas upon the land, and that the "application was not made for the purpose of obtaining title to mineral, coal, oil, or gas lands fraudulently, but with the sole object of obtaining title to the land applied for for grazing and agricultural purposes." So we think this declaration, with the provision in the notice of sale that the successful bidder would be required to execute a contract with such "conditions, obligations, reservations, and terms as may be required by law," with the knowledge that it was a uniform rule of the land

JANUARY TERM, 1925 133

State ex rel. Otto v. Field, 31 N. M. 120

office to insert reservations of minerals in such contracts, which knowledge must be imputed to applicant, was notice to the purchaser that reservations would be made in the contract. .

The commissioner was given ample power to make rules and regulations ''for the control, management, disposition, lease and sale of state lands.'' In the case of Leonard v. Lennox, 181 F. 760, 104 C. C. A. 296, the Circuit Court of Appeals of the Eighth Circuit said of similar powers of the Commissioner of the General Land Office:

"The power of those officers under the law to adopt such a regulation is not reasonably open to question. Although powerless to adopt a regulation which is in any wise inconsistent with or repugnant to the public land laws, they possess ample power to enforce,by appropriate regulations, every part of those laws, as to which it is not otherwise specially provided." .

Another finding of fact made by the court, which bears on the mineral character of the land, was as follows:

"That no minerals have ever been discovered in any of said lands."

This finding was excepted · to, and the making thereof is assigned as error. So far as we know it, it is not claimed that any minerals have been discovered thereon; still, we must consider this finding, and we conclude that there was· no substantial evidence to support it. The nearest approach to evidence on that subject was given by a witness who testified that there were no producing oil wells on the land, and that no drilling had been done thereon, and that no mining operations had been carried on there, and that no oil had been produced from the land, and that no minerals had been produced from the land. The testimony of the witness was limited to the physical fact of production ·from the land, production of various kinds of minerals from the land; the court having held that the witness was not competent to testify as to the indications of minerals or oil. The absence of actual production

does not show in a satisfactory way that no minerals had ever been discovered there.

Appellee, assuming that the commissioner had reached a decision as to the character of the land and had determined that they were nonmineral in character, asserts that such decision could only be set aside in a direct proceeding on the ground of fraud, and that the subsequent discovery of minerals therein would be immaterial. Appellee cites many authorities in support of this proposition, but we deem the decisions inapplicable in view of what we here say. Most, if not all, of these cases dealt with public lands of the federal government, acquired, or sought to be acquired, under the homestead preemption and townsite provision of the public land laws, and concerned dealings with officers of the Land Department of the government, whose discretionary powers are more restricted than the powers reposed in the commissioner of public lands of this state.

It is contended by appellee that, when his bid was accepted and his first payment made and receipted for, he became entitled, on payment of the balance of the purchase price, to a deed for the land purchased, or at his option, a contract under the deferred payment plan calling for a deed to the land purchased. He argues that, as the commissioner advertised that he would sell the land pursuant to the provisions of the Enabling Act, state statutes, and rules and regulations of the land office, the insertion of a clause in the contract, reserving to the fund or institution to which the land belongs the mineral thereof, is a substantial departure from the provisions of law governing the sale of the lands owned by the state, so that such reservation is null and void, and, being void, the appellee is not estopped by his action in signing the written contract containing such void provision. Counsel for appellee cites many federal case. We do not deem these cases applicable. We are merely here consid-

ering whether the commissioner was acting within his discretion in inserting the reservation complained of. As we said in State ex rel. Evans. v. Field, supra, which is a case of similar import, although having some distinguishing features:

"Counsel relies upon the federal cases, and principally that of Burke v. S. P. R. Co., 234 U. S. 669, 34 S. Ct. 907, 58 L. Ed. 1527. We do not deem these United States cases as applicable. Whether the commissioner of public lands has power and authority to make the reservation, which he has made in this case, it is unnecessary for us to determine. If he has not the power, when the purchaser takes a deed with the reservation contained therein, there may arise a question as to the effect of the reservation in some controversy which may arise when the commissioner or some one under him begins to explore for minerals; but mandamus is not a proper remedy to try such a question in a case of this kind where the state itself is involved."

There are among the federal cases cited what is known as the railroad grant cases. We think that these cases fit more nearly in the situation existing in the case at bar, and from them may be drawn reasoning supporting the view we take in this case. Among these cases is Barden v. Northern P. R. Co., 154 U. S. 288, 14 S. Ct. 1030, 38 L. Ed. 992, which declares that it was the intention of Congress to exclude from the grant of land to the Northern Pacific Railroad Company, on July 2, 1864, actual mineral lands, whether known or unknown, and not merely such as were at the time known to be mineral. We do not find that this case has been overruled, but, on the other hand, in the later case of State of Wyoming v. United States, 255 U. S. 489, 41 S. Ct. Rep. 393, 65 L. Ed. 742, this case is cited with approval. In the Wyoming case, supra, the distinction is pointed out between the railroad grant cases and other land cases with respect to the time when the character of the land is to be determined. The court said:

"From the beginning the Land Department, by reason of the terms of those grants (railroad grants) and the restrictive interpretation to which they are subjected, uniformly has construed and treated them as requiring that the character of the land be determined as of the time

136    SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

when the patent issues.    In 1890 Secretary Noble, in de-
clining to disturb this construction and practice pointed
out the reasons which had led the Department to make
a distinction in this regard between those grants and
other land laws, and said: 'This practice, having been
uniformly followed and generally accepted for so long a
time, there should be, in my judgment, the clearest evi-
dence of error, as well as the strongest reasons of policy
and justice controlling, before a departure from it should
be sanctioned.    It has, in effect, become a rule of prop-
erty.'    Central P. R. Co. v. Valentine, 11 Land Dec. 238,
246.    In 1894 the matter came up before this court, and
the construction and practice of the Land Department
were sustained.    Barden v. Northern P. R. Co., 154 U. S.
288, 14 S., Ct. 1030, 38 L. Ed. 992.    As the opinion in that
case shows, the court recognized that the mineral land
exception in other land laws simply operates to exclude
from sale, etc., 'land known at the time to be mineral,'
and was careful to explain that its decision related to
'grants in aid of railroads,' and to 'no other grants.'    The
grounds on which the decision was put were, (a) that the
railroad land grants, besides being confined in the grant-
ing clause to lands 'not mineral,' contain provisos de-
claring in words or effect 'that all mineral lands be, and
the same hereby are, excluded from the operation of this,
grant; (b) that such grants, although expressly requiring
that the question whether the lands are otherwise ex-
cepted be    determined as of the time the map of definite
location is filed, contain no such provision in respect of
the exception of mineral land; (c) that it was well under-
stood that many years would necessarily elapse between
the filing of the map and the time when, by construction
of the road, the grantee would be entitled to patents; and,
as the grants covered great areas, in one instance nearly
equal to that of Ohio and New York, it hardly could have
been intended to arrest mineral development in those
areas in the meantime; (d) that such grants 'must be
strictly construed,' and 'if they admit of different mean-
ings, one of extension and one of limitation, they must
be accepted in a sense favorable to the grantor;' and (e)
that the long prevailing construction and practice of the
Land Department ought not to be disturbed."

The case of Barden v. Northern P. R. Co., supra,
was also cited in the case of United States v. De-
troit Timber & Lumber Co., 200 U. S. 338, 26 S. Ct.
282, 30 L. Ed. 506, to the proposition that, until
patent issues, legal title remains in the government
and subject to investigation and determination.    We
think that that is the proper view to take of the
situation in the case at bar and in similar cases,
under the laws regulating the disposition of the

JANUARY TERM, 1925                137

State ex rel. Otto v. Field, 31 N. M. 120

lands owned by the state of New Mexico, particularly under contracts providing for the deferred payment plan such as in the case at bar.    These contracts run for 30 years, and may be defeated at any time by the failure of the purchaser to keep up the payments under his contract, and it seems to us that the reason suggested in the Barden Case, that it was not intended to arrest mineral development during a long and uncertain period of time, during which a railroad grant might become effectuated by a patent, would be equally applicable to the situation in New Mexico under these long-time contracts, and therefore, for this and other reasons, it was not intended that the legal title should pass until a deed should be executed and delivered to the purchaser, and that during the interim between the acceptance of the bid and the execution of the contract and deed, the question of the character of the land under the jurisdiction of the commissioner of the land office is subject to investigation, particularly when it appears that the reservation had been inserted in the contract apparently with this idea in view.    It is not necessary for us to decide what would be the effect of a deed or patent issued by the state, not containing the reservation complained of in this case.    But it seems to us that at least it would be more consonant with reason to consider that, if there is to be a fixed point of time at which the minerals in the land shall pass to the purchaser, although unknown to exist, that time should be the issuance of the patent from the state and not at the time of application or advertisement and sale thereunder.

Some expressions of the court in the case of Barden v. Northern P. R. Co., supra, will further illustrate the reasonableness of the rules suggested:

"The plaintiff, however, appears to labor under the persuasion that only those mineral lands were excepted from the grant which were known to be such on the identification of the granted sections by the definite location of the proposed road and that the ascertainment at that time of the exceptions from them of parcels of land previously disposed of; and that the want of such knowl-

138     SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

edge operated in some way to eliminate the reservation made by Congress of the mineral lands. But how the absence of such knowledge on the ascertainment of the sections granted and the parcels of land embraced therein previously disposed of, had the effect or could have the effect to eliminate the reservation of mineral lands from the act of Congress, we are unable to comprehend. Such a conclusion can only arise from an impression that a grant of land cannot be made without carrying the minerals therein; and yet the reverse is the experience of every day. The granting of lands, either by the government or individuals, with a reservation of certain quarries therein, as of marble, or granite, or slate, or of certain mines, as of copper, or lead, or iron found therein, is not an uncommon proceeding, and the knowledge or want of knowledge at the time by the grantee in such cases, of the property reserved in no respect affects the transfer to him of the title to it. No one will affirm the want of such knowledge on the identification of the lands granted, containing the reserved quarries or mines, would vacate the reservation, and we are unable to perceive any more reason from that cause for eliminating the reservation of minerals in the present case from the grant of the government than for eliminating for a like cause the reservation of quarries or mines in the cases supposed. And it will hardly be pretended that Congress has not the power to grant portions of the public land with a reservation of any severable products thereof whether minerals or quarries contained therein, and whether known or unknown; yet such must be the contention of the plaintiff or its conclusion will fall to the ground."

This quotation is equally applicable to that portion of the brief of appellee which gives extensive definition of the word "land," and seems to argue that the commissioner had no power to sell anything less than a fee-simple estate in the lands. The fact that the New Mexico Legislature in chapter 82 of the Laws of 1912, which established the office of land commissioner and defined his duties and powers, provided in numerous instances for the sale or lease of timber and other products of the land, indicates that the Legislature fully recognized the custom of making reservations of several products, and that the Legislature never had in mind that the word "land" included the entire fee-simple title thereto, or that the land commissioner was in any way restricted in his managerial capacity from dealing with the various estates that might exist in the lands.

Further, the court in the Barden Case said:

State ex rel. Otto v. Field, 31 N. M. 120

"When the act was passed making the grant to the
plaintiff, it would have been impossible to state with any
accuracy what parts of the tract contained minerals and
what did not.   The fact could only be ascertained after
extensive and careful explorations, and it is not reason-
able to suppose that Congress would have left that im-
portant fact dependent upon the simple designation by
the plaintiff of the line of its road, and the possible dis-
closures of minerals by the way, instead of leaving it to
future and special explorations for their discovery.  To
suppose that Congress intended any such limitaton would
be to impute to it a desire that its exclusion of minerals
from the grant should be defeated, which it is impossible
to admit. It is conceded that in the interpretation of stat-
utes like the one before us, reference may be had not only
to the physical condition of the country and its surround-
ings, but that its political conditions and necessities may
also be considered."

We take note of the fact of the physical condition
of New Mexico and its surroundings from the stand-
point of its finances and of the improbability that
it was possible for the land department of the state
to make an adequate classification and determination
of the lands of the state (some 10,000,000 acres) be-
tween the time of being admitted to statehood and
the date of this contract.   The administrative ruling
of the land commissioner and the legislative act of
1919, both heretofore quoted, also indicate this.

In appellee's brief, he argues that, as the lands in
question were part of the lands donated by the
United States for the purpose of education and
building up the school fund, it was not profitable
or good business for the land commissioner to insert
the reservation, for the reason that the land would
probably be less desirable and less valuable with
some of the several products reserved, and therefore
such practice "will fall far short of giving to the
state the benefits intended by the Enabling Act."
One answer to this proposition is that, if the state
land commissioner had the power to deal with this
property as a manager, then the question of policy on
his part, and as to whether he acted wisely and with
good business sense, is not a matter which the court
would undertake to control or direct.   But, aside
from that, in the Barden Case the Supreme Court

140 SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

suggests that the failure to include reservations of mineral lands would be bad business. They said:

"And we cannot with reason suppose that, under these circumstances, the United States intended that the control of this source of wealth and relief should be taken from them. It passes belief that they could have deliberately designed in this hour of sore distress and fearful pressure upon their finances, to give away to a corporation of their own creation not only an imperial domain in land but the boundless wealth that might lie buried in the mineral regions covered by 80,000 square miles. They knew that the mineral belt over which the proposed railroad was to pass was almost entirely unexplored. They, therefore, retained from their grant the mineral lands, whether known or unknown, and left the discovery of the minerals to future explorations, and their disposition to future legislation. We can never admit that, at the time and under the circumstances upon which the grant was made, Congress intended that its clear words of exclusion of minerals should be interpreted to mean the exact reverse—that when it declared that 'no act of Congress granting lands in aid of railroads' passed during the session of 1864 (the session at which the grant under consideration was made) should 'be construed to embrace minerals,' it means that such act might be so construed."

We think with equal assurance it cannot be supposed that the Legislature of New Mexico, after taking the precaution to provide in leases for reservations of minerals, oil, gas, stone, shale, salt, timber, and all other natural products of the land to be dealt with separately by the commissioner, intended that, when he went to sell grazing land or agricultural land, he would be powerless to reserve to the state and its institutions the great wealth which might flow from a future discovery of minerals in the land, merely because the circumstances had not permitted of his having made an adequate exploration in order to enable him to fully determine the exact character of the land. His policy with respect to these reservations was in accord with the policy of the government with respect to its public lands, and chapter 98 of the 1919 Session Laws of New Mexico was in effect a legislative approval of such policy.

If appellee's contention is correct that, upon the acceptance of his bid and the payment of the first

JANUARY TERM, 1925    141

State ex rel. Otto v. Field, 31 N. M. 120

installment under his contract and the receipt therefor, he is not only the equitable owner of the lands from the center of the earth to the topmost heavens, but also has complete dominion thereover, subject only to defeasance by failure to liquidate the other installment payments under his contract, and that the commissioner had no authority to reserve the minerals, oil, and gas to the state, such minerals, oil, and gas belonging to purchaser, subject only to forfeiture for fraud or for the failure to make installment payments on his 30-year contract, we would face the conclusion that he could, in such enjoyment of the lands, explore for oil and gas immediately after the acceptance of his bid and issuance to him of a receipt for his first installment payment under the contract, and, if he were fortunate in making a discovery of oil, might drain the lands thereof and then abandon his contract.    This would accomplish a result which we do not believe was intended by the Legislature and which, if necessary, the rules of statutory construction authorize us to avoid.

[2] From what we have said concerning the federal cases, we conclude that there is nothing therein to impel to the conclusion that the reservation in the contract is void.

As to the contention of appellee that the provision of section 10 of the Enabling Act, to the effect that a sale not in substantial conformity with the provisions of that act shall be null and void, and that the reservation complained of in this case is a substantial departure from the provisions therein contained, defining the method of making the sale, and is therefore void, we think what we said in Neel v. Barker, 27 N. M. 605, 204 P. 205, is sufficient answer thereto.    In that case we said that the restrictions and limitations of that act, in regard to the sale, lease, conveyance, or contract of or concerning any of the lands granted or the use thereof or the natural products thereof, do not apply to a grant or lease to explore for oil and gas executed by the commis-

sioner of public lands of New Mexico, for the reason that, when that act was formed and enacted, it was not contemplated that any lands, mineral in character, should be granted to ·the state, and that it would be inconsistent to say that Congress intended by said section 10 to provide that the formalities described in that section should apply to minerals in the land, and that therefore the mandatory directions in section 10 have no application to the mineral estate in the land.

A similar argument was made in the case of Leonard v. Lennox, 181 F. 760, 104 C. C. A. 296 (Eighth Circuit). This was a case involving the right to a patent under the public land laws, where all requirements of the statute and authoritative regulations of the Land Department were not complied with. The Department had initiated a regulation requiring an affidavit that the lands were not saline lands. The court said:

"The newly enacted Saline Land Act in effect prohibited the acquisition of public lands chiefly valuable for salines under any law other than the mineral land laws, and neither it nor any other law designated any particular means by which this prohibition was to be enforced. Thus the selection of some appropriate means ˙devolved upon the Commissioner, subject to the Secretary's approval. Rev. St. §§ 441, 453, 2478 (U. S. Comp. St. 1901, pp. 253, 257, 1586 [U. S. Comp. St. §§ 681, 699, 5120]; Bishop of Nesqually v. Gibbon, 158 U. S. 155, 166, 15 S. Ct. 779, 39 L. Ed. 931. * * * In urging its invalidity, the appellee places some reliance upon section 2290 of the Revised Statutes as amended by Act March 3 1891, 26 Stat. 1097, c. 561, § 5 (U. S. Comp. St. 1901, p. 1389 [U. S. Comp. St. § 4531]), which declares that applicants under the general homestead law, who comply with certain enumerated conditions, which do not include a showing respecting the character of the land applied for, 'shall be permitted to enter the amount of land specified'; the argument presented in this connection being that the legislative enumeration of particular conditions is an implied prohibition against the imposition of others by executive regulation. We think the argument must fail, and for these reasons; Section 2290 does not say that, upon compliance with the enumerated conditions, the applicant shall be permitted to enter the land applied for, but only that he shall be permitted to enter 'the amount of land specified,' meaning the number of acres named in the preceding section. The prohibition against the acquisition of mineral, coal, and

State ex rel. Otto v. Field, 31 N. M. 120

saline lands under the homestead law does not arise from
anything contained in that law, but from provisions in the
mineral, coal, and saline land laws, which take precedence
over and qualify the homestead law in that regard.  Sec-
tion 2290 is a part of the general homestead law and re-
lates to the enforcement of its restrictive provisions, but
not to the enforcement of the prohibitive or qualifying
provisions of the mineral, coal, and saline land laws.    As
to the latter, the means of enforcement are not specially
prescribed by statute, and so may be designated by exec-
utive regulation under sections 441, 453, and 2478, of the
Revised Statutes, which empower the commissioner, under
the direction of the Secretary, to enforce, 'by appropriate
regulations,' every part of the public land laws, as to
which it is not other wise specially provided."

So, in this case, the prohibition against the ac-
quisition of mineral, coal, oil, and gas under the
Enabling Act and the Constitution and laws of the
state does not arise from anything contained in the
Enabling Act, but from provisions of our statutes
dealing with the subject of mineral, coal, oil, and
gas.    And it would seem that, in the absence of
any specific direction by the Legislature as to the
means to be used for the protection of these prod-
ucts and their retention for the purpose of augment-
ing the school funds of the state in case of the sale
of lands, it devolved upon the commissioner to select.
some appropriate means to enforce this prohibition
under his power of "management, care, custody,
control, and disposition thereof."

Appellee also contends that, where the Constitution
and statute conveying powers on the commissioner
fail to specifically authorize him to reserve the
minerals, he has no such power.    We do not agree
to that narrow construction of the powers of the
commissioner.    If it was intended by the Constitu-
tion makers and the Legislature to cover every con-
tingency, they would not, at the time of giving spe-
cific directions, also repose general jurisdiction or
power of control and disposition over the state lands.
As we said in State ex rel. Evans v. Field, supra:

"It is to be remembered that the lands involved are a
portion of the lands granted in trust to the state by the
federal government for certain specified purposes.    The
grant is of the fee, and when the required preliminaries

of selection by the state had been performed, and the government had clear-listed the same to the state, it became the absolute owner of the lands, subject only to the trust imposed by the granting act. In order to avail themselves of the grant, the people in their Constitution created the office of commissioner of public lands (section 1, art 5), and clothed him with power to select, locate, classify, and have the direction, control, care, and disposition of all public lands, under the provisions of the act of Congress relating thereto, and such regulations as might be provided by law (section 2, art 13). At the first state Legislature an act was passed somewhat amplifying the constitutional provisions (see sections 5178 et seq., Code 1915), and in section 1 of the act (section 5178, Code 1915) his jursdiction over the land is somewhat more broadly stated, to the effect that it extends to all cases except as otherwise specifically provided by law."

It will be noted under the provisions of our Constitution the lands may be held or disposed of. In the language. of the Supreme Court of the United States:

"The expression 'to dispose of' is very broad, and signifies more than 'to sell.' Selling is but one mode of disposing of property." Phelps v. Harris, 101 U. S. 370, 25 L. Ed. 855.

And again, it is said that, when a contract respecting property contains an agreement to be performed by the owner of it when he shall "dispose of" or "sell" it, it is obvious that the words "dispose of" are not synonymous with the word "sell"; and their meaning must be determined by considering the remainder of the contract. Hill v. Sumner, 132 U. S. 118, 10. S. Ct. 42, 33 L. Ed. 284.

In United States v. Gratiot, 14 Pet. 526, 10 L. Ed. 573, the same court held that article 4, § 3, of the federal Constitution, which provides that Congress shall have power to dispose of and make all legal rules and regulations respecting the territory or other property belonging to the United States, not only vests in Congress the right to sell the lands belonging to the United States, but also to lease the same. In this case a lease by the President, under regulations provided by Congress authorizing him to dispose of the lands of the United States, was held valid. Many other cases might be cited where these

JANUARY TERM, 1925      145

State ex rel. Otto v. Field, 31 N. M. 120

words, as used in legislative grants, deeds, wills, and other contracts, have been given like construction. 3 Words and Phrases, 2114.

In this connection it will be noted that in section 5233 of the New Mexico Code the words ''sell'' and ''dispose of'' are both used. The same is true of section 5264, where the words ''sold or disposed of'' are used, and of section 5179, where the phrase used is ''disposition, lease and sale.''

It will be noted that the first section of the act creating the land office (chapter 82, Laws 1912)· declares:

"That a state land office is hereby created, the executive officer of which shall be the commissioner of public lands, hereinafter called the commissioner, who shall have jurisdiction over all lands now owned or hereafter acquired by the State, except as may be otherwise specifically provided by law. * * *"

We observe that the foregoing is not accurately set forth in Code, § 5178, but such quotation is cor-, rect.

And by section 5179 he is given authority to ''make rules and regulations for the control, management, disposition, lease and sale of state lands.''

Rules of statutory construction, which will be helpful in considering this grant of power, may be found in Black on Interpretation of Laws, p. 89, where it is said:

"Whenever powers, privileges, or property are granted by a statute, everything indispensable to their enjoyment or exercise is impliedly granted also, as it would be in a grant between private persons. * * * Whenever the statute grants power to do an act with an unrestricted discretion as to the manner of executing the power, all reasonable and necessary incidents to the manner of executing the power are also granted."

The United States Supreme Court, considering the power of the Secretary of the Interior as defined in a statute declaring, "the commissioner of the General Land Office shall perform, under the direction of the Secretary of the Interior, all executive duties

146        SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

appertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such public lands,'' U. S. Comp. St. § 699, said, in Catholic Bishop v. Gibbon, 158 U. S. 155, 15 S. Ct. 779, 39 L. Ed. 931:

"Referring to this latter section, and particularly the clause 'under the direction of the Secretary of the Interior,' it was said by Mr. Justice Lamar, speaking for the court in Knight v. Land Association, 142 U. S. 161, 177 [12 S. Ct. 258, 35 L. Ed. 974]: 'It means that, in the important matters relating to the sale and disposition of the public domain, the surveying of private land claims and the issuing of patents thereon, and the administration of the trusts devolving upon the government, by reason of the laws of Congress or under treaty stipulations, respecting the public domain, the Secretary of the Interior is the supervising agent of the government to do justice to all claimants and preserve the rights of the people of the United States.' See, also, Barden v. Northern Pacific Railroad, 154 U. S. 288 [14 S. Ct. 1030, 38 L. Ed. 992], and cases cited in the opinion. It may be laid down as a general rule, that, in the absence of some specific provision to the contrary in respect to any particuaur grant of public land, its administration falls wholly and absolutely within the jurisdiction of the Commissioner of the General Land Office, under the supervision (and direction) of the Secretary of the Interior."

The statute then under consideration by the court was not any broader in its terms than our statute conferring on the commissioner jurisdiction over state lands.

" 'Jurisdiction,' like many other words in general use, has different meanings dependent upon the connection in which it is found and the subject-matter to which it is directed. But it is always a word of comprehensive import." Commonwealth v. Breakwater Co., 214 Mass. 10, 100 N. E. 1034.

An old and respected maxim is that—

"To whomsoever a jurisdiction is given, those things also are supposed to be granted, without which the jurisdiction cannot be exercised."

In the case of State v. Hall, 23 N. M. 422, 168 P. 715, which was a case involving the powers of a boundary commission created by the Legislature of the state of New Mexico, we said:

JANUARY TERM, 1925          147

State  ex  rel.  Otto  v.  Field,  31  N.  M.  120

"It may be stated, that, when statutes confer powers, impose duties, and provide for the accomplishment of various objects, they are necessarily couched in general terms; but they carry with them, by implication, all the powers, duties, and rights necessary to accomplish the objects thereby sought to be attained.    In 26 Ency. of Law, p. 642, it is said: 'When a power is conferred by statute, everything necessary to carry out the power and make it effectual and complete will be implied.'    The commission in question having been created for the purpose of investigating and settling the boundary dispute with Colorado, all powers essential to the accomplishment of that object would be necessarily vested in the commission."

The foregoing expressions are a sufficient announcement of the doctrine controlling, but a few additional illustrations may be helpful in making the application of this doctrine more clear.    The case of State v. Nestos, 48 N. D. 894, 187 N. W. 233, rehearing denied, 187 N. W. 619, involved the power of the Industrial Commission of North Dakota to make a loan.    The court said:

"The members of the Industrial Commission were 'empowered and directed to manage, operate, control and govern all utilities, industries, enterprises and business projects,'˙ then or thereafter established, owned, undertaken, administered or operated by the state of North Dakota, * * *'    and was given exceedingly broad powers in discharging the duties imposed upon it.    See chapter 151, Laws 1919. It will be noted that, while the Legislature authorized the commissioner of insurance and the Industrial Commission to make a loan for the purpose of paying obligations for hail losses, no provision was made as to the manner in which the power so granted should be exercised.    It does not follow, however, as contended by the relator, that these officers˙ are precluded from exercising the power conferred and performing the duty imposed upon them because the Legislature failed to prescribe the particular mode in which such power should be exercised˙ and the duty performed. An express statutory grant of power or the imposition of a definite duty carries with it by implication, in the absence of a limitation, authority to employ all the means that are usually employed and that are necessary to the exercise of the power  or the performance of the duty.    25 R. C. L. pp. 979, 980; 36 Cyc. 1113; 2 Lewis' Sutherland, Stat., Const. 563; Newcomb v. Indianapolis, 141 Ind. 451, 40 N. E. 919, 28 L. R. A. 732; Fuller v. Board of University and School Lands, 21 N. D. 212, 129 N. W. 1029.    That which is clearly implied is as much a part of a law as that which is expressed."

148    SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M, 120

As applied to the case at bar, what could be a more usual exercise of power with respect to safe-guarding the possible valuable mineral estate in land than to reserve such mineral estate to the grantor when selling the land?

The language of Mr. Justice Field, in the Barden Case, is so apt in this connection that we repeat it here:

"The granting of lands either by the government or individuals, with a reservation of certain quarries therein, as of marble, or granite, or slate, or of certain mines, as of copper or lead, or iron found therein, is not an uncommon proceeding, and the knowledge or want of knowledge at the time by the grantee in such cases, of the property reserved in no respect affects the transfer to him of the title to it."

It is a matter of common knowledge that the owners of large land grants and others in this state have frequently and usually reserved the mineral estate when conveying land.

It is a matter of history that it had been the practice of the New Mexico state land office, since its creation in territorial days, to reserve minerals, not only in leases of grazing and agricultural lands, but also in contracts for the sale of such lands, and, from the making of the first contract of sale in that office, reservations substantially the same as the one used in the contract in the case at bar were inserted in all instruments affecting the transfer of any of the state's interest in its public lands. This shows that it was not only usual, but it will also be assumed that the Constitution makers and the members of the Legislature were conversant with such practice, when they created the office of the commissioner of public lands of the new state in 1912, and bestowed upon him the broad powers which are recited in the Constitution and statutes.

"It must be assumed that Congress was familiar with the operations and practice of the Land Department." Stockley v. United States, 260 U. S. 532, 43 S. Ct. 532, 67 L. Ed. 390.

Touching upon this question of the commissioner being required to sell the entire estate in the land and pass the title in fee simple or not, a recent decision of the Supreme Court of the United States is helpful to our consideration.    In Price v. Magnolia Petroleum Co., 267 U. S. 415, 45 S. Ct. 312, 69 L. Ed. —, decided March 2, 1925, the facts in part and the decision are stated in the syllabus as follows:

"(1)    The provision in the Oklahoma Enabling Act that, where any lands granted to the state are valuable for minerals, they shall not be sold before a specified date, but may be leased upon royalty, providing that the mining lessee shall reimburse the agricultural lessee for damage done by the mining operations, applies not merely to .lands known to be mineral at the time of its passage,. but to those that might thereafter be found to be valuable for such purposes.

"(2)    The    provision    of    the    Oklahoma    Enabling    Act that sections of land numbered 33, granted to the state for specified purposes, might be disposed of as the Legislature might prescribe, and that, if sold, they might be appraised and sold under such rules and regulations as the state might prescribe, preference right to purchase at highest bid being given to the lessee at the time of such sale with a provision for appraisal of and reimbursement for improvements in case the lessee did not become purchaser, gave the lessee no right to purchase the entire property, including the mineral rights, which could not be subsequently changed by the Legislature in segregating the mineral rights and leasing them separately without unconstitutionally depriving him of his property without · due process of law.

"(3)    The    preference    right    of    purchase    given    by    the. Oklahoma Enabling Act to the lessees of the sections of . land numbered 33, which had been granted to the state for specified purposes, was merely a right to purchase land in the condition in which it might be when and if the state chose to sell it, and not a right to compel the state to sell it, either in its entirety or otherwise, whenever they wished to buy."

The court, in the course of the opinion, used language as follows:

"We thing it clear that these provisions of the Enabling Act, read together, gave the state entire discretion as to the time of selling these lands and the extent to which they should .be sold.    They did not require that all or any part of them should be sold, but merely provided that "if" the state sold them, they must be sold in the manner

prescribed, and the preference right of purchase be given the lessee in possession at the time of the sale. The state was not bound to sell them at any time, or at all, but might retain them as long as it deemed proper, and make meanwhile such leases as it desired, not in conflict with the provisions of the act. There was no provision in the act, and, none was implied, that the agricultural lessee might require the state to sell the land in its entirety whenever he desired to purchase the same; and nothing that gave him any right to purchase the land in its entirety, or that prevented the state from executing oil and gas leases, as well as agricultural leases, whenever it deemed this the most advantageous method of realizing the full value of the lands, for the public purposes for which they were granted to it. Plainly, it was not intended that the mere making of an agricultural lease should put the state at the mercy of the lessee, and require a sale of the land before its value had been ascertained or the available revenue derived from it. In short, the preference right of purchase given the lessee by the act was merely the preference right of purchasing the land in the condition in which it might be when and if the state chose to sell it; and not a right to compel the state to sell it either in its entirety or otherwise, whenever he wished to buy.

As there was no question in this case as to acreage or territorial limits of the land involved, the statement by the court referring to the extent to which the lands should be sold, and the suggestion that the commissioner could sell the land in its entirety or otherwise, could not refer to anything else excepting the entire fee-simple title or to a separate estate of some sort in the land. A similar phrase was used by the Court in Gunter v. Walpole, 65 Colo. 234, 176 P. 290:

"We cannot say as a matter of law, that the amount offered by the successful bidder ,in the circumstances is the same as would have been paid if the land had been offered for sale in its entirety, undiminished by reservations or exceptions."

It seems to us that this language is in accord with our view that, under the Enabling Act, Constitution, and statutes of New Mexico, the commissioner may sell or hold the state lands as his judgment and discretion may dictate and that he may exercise "entire discretion as to the time of selling these lands and the extent to which they should be sold," and

that no one has the right to compel the commissioner to sell the lands in its entirely or otherwise, and that, if he elects to sell the land otherwise than in its entirety, he is within his jurisdiction to do so. To hold otherwise would lead to an absurd result. The commissioner has been specifically directed by the Legislature to lease the known minerals, to make leases and contracts to explore for the unknown minerals, to grant rights of way and easements over and across and upon state lands for eight specific purposes and for other purposes which are left to the discretion of the commissioner. If, in the exercise of this discretion, the commissioner has made leases, contracts, and made grants of rights of way and easements, he would be powerless to sell the land, if he must sell it in its entirety or not at all. If the commissioner might encumber the land with leases, contracts, grants of rights of way, and easements before the land is sold, and then afterwards sell the land subject to these incumbrances, we are unable to see why he may not, in case of sale of land, reserve the right to later incumber it, if the purchaser is willing to buy with such a reservation. The commissioner is, specifically, by section 5233 of the Code, directed to insert in leases of state lands for grazing or agricultural purposes a clause reserving the right to execute leases for mining purposes thereon or for the execution of petroleum, natural gas, salt, or other deposits therefrom, and the right to sell or dispose of any other surface products of such lands other than grazing, agricultural, or horticultural products; also a clause reserving the right to grant rights of way and easements for any of the purposes mentioned in section 5231. It being apparent that it was the policy of the Legislature to reserve to the state the right to execute leases for the extraction of petroleum, etc., it seems reasonable that the commissioner could also make the same reservation in a contract for the sale of agricultural or grazing lands sought to be purchased, and in which it was not then known than any mineral products existed.

The case of Fuller v. Board of University and School Lands, 21 N. D. 212, 129, N. W. 1029, reports another good illustration of the application of this doctrine, and we select it because of the language used with referncee. to the purposes and objects of the creation in that state of the office of commissioner of University and school lands, and which is also invested with powers similar to our commissioner of public lands.     The following is a quotation from the statement of facts. in that case:

"Plaintiff brings mandamus to compel execution and delivery of a contract for the sale of school lands which defendant commissioner struck off to plaintiff at a sale of school lands in Steele county, at which plaintiff was the highest and only bidder for certain lands.     All preliminaries prior to sale were complied with, and on the sale payment was made by the purchaser to the county treasurer pending approval of the sale by the board of University and school lands.     After an investigation and on information before it, said board disapproved the sale, finding fraud and collusion between the plaintiff and other bidders at the sale, and on plaintiff's petition for review by the board the sale was again dsapproved for inadequacy of price paid for the land.     *   *   *   After trial, the court dismissed the proceeding, holding the decision of the board final and conclusive, and not subject to review by mandamus, from which decision plaintiff appeals, alleging specifications of error sufficient to bring all questions embodied in the record before this court for determination."

Discussing the powers of the board of commissioners, the court said:

"As to the powers of said board it is significant that the Constitution, section 156 above quoted, gives said board general powers in these words: 'Said board shall have control of the appraisement, sale, rental and disposal of all school and University lands.' This has been construed and made even more. definite by section 153, Rev. Codes 1905, providing.   "Such board shall have the full. control of the selecting, appraisement, rental, sale, disposal and management of all school and public lands of the state.' *   *   *   With this grant of general power is expressly and impliedly conferred the duty of using judgment and discretion in such matters, commensurate with the importance of the trust reposed in it.     This is the plain intent of the Constitution and statute creating the board and defining its duties.   It is then a board vested with discretion in the performance of its duties generally, except where it is by law specially limited therein..   *   *   *

State ex rel. Otto v. Field, 31 N. M. 120

"To do their duty, they must remember the board is a trustee for the state, in the matter on which it acts; that the Constitutions vests it with power over the school lands and thereby supervision over the school fund which the Constitution by express terms, says shall remain 'inviolably appropriated and applied to the specific objects of the original grants,' the schools of this state.    Under every rule of publc policy the proper execution of its trust demands that every sale of school land by this board shall be as is aptly declared in State v. Scott, 17 Neb. 686, 24 N. W. 337, 'for the highest price possible to be obtained to increase and protect by all honorable means the funds for the support of the educational institutions,' * * *

"Viewed in the light of the reasons for these constitutional and statutory enactments, the importance of the duties conferred upon the board so created the necessity for the exercise of· a high degree of judgment and discretion by a tribunal competent to do so and charged with administering as a trustee of the millions in this greatest of all state funds—our school fund—would it not be most absurd to do otherwise than to give full force to the mandate of the Constitution and statute granting full power to this board in the exercise of discretion and judgment in this the most important part of its duties, approval of sales of state property?"

As we have seen, the commissioner was given almost unlimited power with respect to the public lands owned by the state, "except as may be otherwise specifically provided by law." Now the rule announced with respect to the construction of a grant of power is not applicable to exceptions and restrictions upon the exercise of power. As was said in Greenlee County v. Laine, 20 Ariz. 296, 180 P. 151:

"It· is a general rule that, where no exception is made in terms, none will be made by mere implication or construction."

In Imperial Irrigation Co. v. Jayne, 104 Tex. 395, 138 S. W. 575, Ann. Cas. 1914B, 322, it is said:

"In the construction of Constitutions, as well as of statutes, it has often been held that the powers necessary to the exercise of a power clearly granted will be implied; but we know of no case in which the express grant of. a power, legislative in its character, has been held to carry with it an implied prohibition to exercise a power of that character, unless such implication is necessary to the full and free exercise of the power clearly given. As said by a distinguished elementary writer, when the power which

is expressed is legislative in its character, the courts can only enforce those limitations which the Constitution imposes, and not those implied restrictions which, resting in theory only, the people have been satisfied to leave to the judgment, patriotism, and sense of justice of their representatives. Cooley Const. Lim. 129."

That case involved the constitutional power of the Legislature to grant rights of way over state lands for irrigation purposes, and the court, in upholding the legislative authority, said:

"From the view we take of the law, it seems to us to be settled by the decisions of this state that the Legislature has power to deal with the public school lands in any manner not inconsistent with the express denial of the Constitution. As stated by Judge Stayton in Smisson v. State, 71 Tex. 233, 9 S. W. 116, in discussing that section of the Constitution, § 4, art. 7, invoked in this case in denial of the legislative authority to grant an easement on any portion of the public school lands of the state for dam and reservoir sites. 'A power clearly legislative in its character, not expressly denied to the Legislature, ought not to be held denied by implication, unless its exercise would interfere with, frustrate, or to some extent defeat the exercise of a power expressly granted.' "

We think the same rules are applicable where the Legislature has granted general powers to an executive officer to administer the public lands of the state.

What was the object to be accomplished by the grant to the state of these lands and by our public land legislation? Unquestionably the object in the grant of lands to the state, and the constitutional and statutory provisions relative thereto, was the augmentation of the school fund of the state. We see that the Legislature had very jealously guarded the interests of the state in any mineral deposits in the land by providing that they could not be sold knowingly, and by providing that they should be reserved when leases were made, and it would seem to us that, if the commissioner has been given full power and jurisdiction of the management and control of the state lands except as may be otherwise specifically provided by law, in pursuance of a common practice, he would have abundant authority in

dealing with lands which were not known to contain minerals to reserve for future disposition any minerals which might thereafter be discovered, and dispose of the surface rights in such lands.

Again, it is stated at page 91 of Black on Int. of Laws:

"Where an act confers a jurisdiction, it impliedly grants also the power of doing all such acts, or employing such means, as are essentially necessary to its execution."

As showing that the duties of the commissioner were not ministerial merely, but that that officer was invested with a very large discretion, and that tht construction which we place on the statute to the effect that the Legislature intended to invest in the commissioner with the word "jurisdiction" absolute dominion over the state lands, excepting only as such jurisdiction was specifically limited by law, we find many expressions in the statute creating the office which bears out this idea.  In section 5179, we find that the commissioner had the right to collect money due for the lease, purchase, or use of state lands; he was directed to make a report to the Governor each year, with recommendations as he might deem proper for the better management and control of the state lands.  In the same section he was empowered to make rules and regulations for the control, management, disposition, lease, and sale of state lands, and perform such other duties as may be prescribed by law.

It is a rule of statutory construction that effect must be given to all of the words of the statute. If the Legislature had intended to confine the use of the land under the jurisdiction and control of the commissioner to the lease and sale thereof, the Legislature would not have authorized him to make rules and regulations also for the control, management, and disposition thereof.

Nowhere in the statute is any provision made for any supervisory control over the acts of the commissioner excepting in the case of contest concerning

156    SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

lands when an appeal may be taken from the decision of the commissioner to the district court. He is responsible alone to the electorate for any lack of proper business capacity or any misdoings in office.

By section 5201, the commissioner was prohibited from selling lands belonging to the state and known to contain deposits of coal. Section 5218 provides that lands known to contain valuable minerals shall not be sold, and appellee argues that, as it is the constitutional duty of the commissioner to classify the lands, he must be presumed, before offering lands for sale, to have classified them as nonmineral lands. Appellee overlooks other sections of the statute. By section 5209, the commissioner was given power to execute leases and contracts for the prospecting and development of any lodes or deposits of metal or minerals in rock in place upon or in any land now belonging to the state, or which it may hereafter acquire. Note the difference between these two sections. Section 5209 assumes that the lands to be so prospected were not known to be mineral lands. Section 5209 is distinguished also from section 5213, which provides that, in the event a locator sinks a shaft and discovers ore in rock in place upon the location, the commissioner shall execute in favor of such locator a lease granting the right to mine and extract ores from said location during a term not exceeding 5 years. By section 5216, the lessee of such mineral lands has a preferential right to a renewal lease or to purchase during the life of such lease. References to sections 5209 to 5215 makes it plain that the term ''mineral lands,'' used in section 5216, means lands upon which metals or minerals have been discovered in rock, in place; hence they must be ''lands known to contain valuable minerals'' within the meaning of section 5218.

From this section 5216 there is a plain inference to be drawn that either the lessee or another may purchase, and hence the commissioner may sell, some estate in the lands independent of the minerals. It is plain that the mineral content is to be disposed

JANUARY TERM, 1925 157

State ex rel. Otto v. Field, 31 N. M. 120

of only on lease, from which the state is to derive
royalties. There is nothing left except the surface
of the land to which this section can apply. In
construing this chapter, both sections 5216 and 5218
are equally entitled to consideration. Giving both
the weight to which they are entitled, it is impossible
to reach the conclusion that appellee reaches,
namely, that mineral lands are under no circum-
stances to be sold, and that the Legislature had
adopted a policy against the severing of the min-
eral rights and the surface rights. The inference
that the Legislature contemplated that the commis-
sioner might sever the surface rights from the min-
eral rights and reserve the one and sell the other
finds further support in section 5235, which provides
that—

"All lands, or any interest therein, sold or contracted to
be sold, under the provisions of this chapter upon de-
ferred payments shall be subject to taxation."

It is not necessary for us to speculate as to what
kind of interest the Legislature contemplated, but it
seems clear that, if the Legislature intended that the
lands should be sold in their entirety or not at all,
they would not, in referring to a sale, have used the
expression, "all lands, or any interest therein." It
must be apparent that this clause, "any interest
therein," could not refer to the mineral estate in
the land, because there was a specific inhibition
against the selling of mineral lands. An inference
may be properly drawn from this section that, if it
were known that the lands contained valuable min-
erals, an interest therein might be sold, exclusive of
the minerals, as for instance, the surface. Section
5231 provides that the commissioner may grant rights
of way and easements over, upon, or across state
lands for public highways, railroads, tramways, tele-
graph, telephone, and power lines, irrigation works,
mining, logging, and for other purposes. We know
as a matter of history that it has been the policy,
both of the United States and of the state of New
Mexico, to grant upon the public lands all kinds of

rights of way for railroads, highways, telegraph and telephone lines, irrigation ditches, etc. Here we find a specific direction to the commissioner to reserve the right to grant rights of way and easements when leases are given. It seems to us unlikely that the Legislature intended to reserve this important privilege in the case of leases, and that the commissioner would be powerless to make such reservations in case of sales under the deferred payment plan, if the public interest required it. Suppose when the land had been offered for sale the various rights of way had been previously granted over the state lands. According to the contention of the appellees with respect to what is embraced within the term ''lands,'' the state would be powerless to dispose of the lands upon which easements and rights of way had been granted, because in that case the state would be unable to give a title in fee simple to the lands, because it would be subject to the reservations and incumbrances for easements and rights of way which had theretofore been granted.

It seems absurd to suppose that it could be argued that, if the state had granted easements and rights of way over its lands, it could not thereafter sell the lands subject to the easements and rights of way. Yet such in effect was the contention in a recent case that went to the Supreme Court of the United States. Swendig v. Washington Water & Power Co., 265 U. S. 322, 44 S. Ct. 496, 68 L. Ed. 1036. It was there argued that the patent issued to appellant revoked or cancelled the permits theretofore granted to appellee by the Secretary of the Interior for the use of a right of way upon which to construct and maintain a power transmission line through the land involved. In other words, it was contended by appellant that, when conformably to the laws, entry is made and certificate given, the land covered ceased to be a part of the public lands, and that, when a patent issues in accordance with government statutes, all title and control of the land pass from the United States. It appears that the

power conferred upon the Secretary should be ex-
ercised "under general regulations to be fixed by
him." It appears that, when the homestead entries
were made, there existed a regulation containing the
following:

"The final disposal by the United States of any tract
traversed by the permitted right of way is of itself, with-
out further act on the part of the Department a revoca-
tion of the permission so far as it affects that tract, and
any permisson granted hereunder is also subject to such
further and future regulations as may be adopted by the
Department."

August 24, 1912, before the patents were issued,
this provision was superseded by the following regu-
lation:

"The final disposition by the United States of any tract
traversed by a right of way permitted under this act shall
not be construed to be a revocation of such permission
in whole or in part, but such final disposal shall be deemed
and taken to be subject to such right of way until such
permission shall have been specifically revoked in accord-
ance with the provisions of said act."

At the same time the Secretary, by regulation, re-
quired that all patents issued should have on their
face a notation of prior permits. The court said:

"But we hold that, under the act and the regulation
made pursuant to it and in force when the patents issued,
these rules do not operate to strike down rights, subject
to which, under the law, the lands are patented. Under
the permission of the Secretary, the power line had been
constructed and was maintained on the right of way over
the lands in question for a long time before the reserva-
tion was opened for settlement. The entries were made
subject to the regulations then in force, and were affected
by the provision that 'any permission granted hereunder
is also subject to such further and future regulations as
may be adopted by the Department.' The fact that the
patents did not have thereon a notation of the prior per-
mit is not controlling. Under the regulation then in force,
final disposition did not revoke the permit, but was made
subject to the use of the right of way for the power line.
It was intended that the patent should not extinguish the
earlier permission given by the Secretary. The issuing of
the patents without a reservation did not convey what the
law reserved. They are to be given effect according to
the laws and regulations under which they were issued."

160    SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

The opinion of the court and of the Circuit Court of Appeals in this case suggests several principles which are applicable to the case at bar, some of which have elsewhere herein been touched upon: (1) The power to make regulations in the exercise of the power conferred upon the executive officer of the land department to administer the lands under his jurisdiction is very comprehensive; (2) persons dealing with the land department are chargeable with notice of the rules and regulations of the land office; (3) patents are to be given effect according to the laws and regulations under which they were issued, even those regulations made after the rights of the entrymen were initiated.

As we have seen, it had long been the regulation and practice of the territorial and state land offices to insert in contracts of sale such reservations of minerals, oil, and gas as is challenged in this case. Appellee was charged with notice of this practice, which was in effect a rule of that office. He was advised by the advertisement of sale that the contract he would be required to execute would contain such reservations, conditions, and terms as might be required by law, which means such as the commissioner might lawfully require. He was just as effectively notified of the character of the reservation as if it had been set out in the notice of sale. A course of practice uniformly followed as a rule. Schaufele v. Central of Georgia, 6 Ga. App. 660, 65 S. E. 708, 710; Talbot v. Seeman, 5 U. S. (1 Cranch) 136, 2 L. Ed. 15; 34 Cyc. 1818.

If, pursuant to specific legislative direction, the commissioner could incumber the land with easements, rights of way, contracts, permits to explore for minerals, and later sell the land subject to these incumbrances, we are unable to see why he might not, when making a sale on the deferred payment plan, reserve the right to the state to control these privileges later on. Much is said in the cases concerning the policy of the government or of the various states respecting the disposition of the public

JANUARY TERM, 1925 161

State ex rel. Otto v. Field, 31 N. M. 120

land as a means of aiding in the construction of statutes granting powers to officers who shall have the disposition thereof. In Barden, v. N. P. R. Co., supra, the court said:

"The policy of Congress as expressed in its numerous grants of public lands to aid the construction of railroads has always been to exclude the minerals from them, and reserve them for special disposition, as seen in the following acts among others: [This quotation proceeds with an enumeration of many acts of Congress.] In all of these cases, and in all grants of public lands in aid of railroads, minerals (except iron and coal) have uniformly been reserver, and in no instance has such a grant been held to pass them. Patents issued after an examination and determination of the fact by the government whether portions of the land embra ed in such grants did or did not contain other minerals have been held as conclusive in subsequent controversies, and of this we shall speak more fully hereafter; but grants in aid of railroads (and we speak of no other grants) before such determination and issue of a patent have never been held to pass other minerals than iron or coal, and it is only with other minerals, and with lands containing them, that we are concerned in this case."

The policy of the state of New Mexico in this regard may be gathered from facts which are matters of common knowledge, showing that it was the uniform practice of the land office in territorial days, from the time of its creation, to insert in all contracts for the purchase of land belonging to the state a reservation almost identical in terms with the one in the contract in this case. In the contracts executed by the land department of the state, beginning with the first one (following the practice of the territorial land office), such reservation was inserted.

In the early part of January, 1916, Attorney General Clancy gave an opinion to the commissioner of public lands to the effect that he was within his power to sell timber lands. The statute gave power to the commissioner to sell the timber separately, and there being no prohibition in the Constitution, Enabling Act, or statutes against the sale of the land with the timber, and no specific direction that he should sell, it was held that there was no limitation upon the power of the commissioner to dispose of it in that manner. A similar

162      SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

question in Idaho gave rise to the cause of Pike v. State Board of Land Commissioners, 19 Idaho, 268, 113 P. 447, Ann. Cas. 1912B, 1344. This was a case involving the power of the board of land commissioners to sell the fee in lands where the timber thereon had previously been sold. It was decided that:

"Where the state sells the timber standing and growing on a tract of land and grants to the purchaser the right of possession for the period of 20 years from the date of sale for the purpose of cutting and removing the timber, and provides that all timbers that remain standing on the land at the expiration of the 20 years shall belong to the state, a subsequent sale of the land and grant of the fee by the state conveys to the purchaser all the timber that may remain standing upon the land at the expiration of the 20-year period, and the purchaser of the timber has no further right after the expiration of that period to enter upon the land or remove timber, and has no further right in any timber on such land.

The following observations of the court are applicable to the case at bar, as showing the general powers of officers dealing with the public land under statutes similar to ours:

"The power of location, protection, sale and rental of these lands is vested in the state board of land commissioners. * * * It is next contended that the proposed sale is contrary to the public policy of the state. * * * As a matter of policy and business expediency this argument might appeal to the board, but it cannot be considered by the court. In the first place, the Constitution vests the control, management, and disposition of state lands in the state board of land commissioners. Section 8, art. 9. They are, as it were, the trustees of business managers for the state in handling these lands, and on matters of policy, expediency and the business interest of the state, they are the sole and exclusive judges so long as they do not run counter to the provisions of the Constitution or statute. Counsel fail to call our attention to any established public policy in this state which runs counter to the course pursued by the board. Indeed, all of our statutes since statehood have authorized the sale and leasing of state lands and it has been the uniform policy apparently of the various land boards from time to time to lease state lands and to sell timber from state lands and to sell the lands in fee, whether they be leased or not leased. The public policy of the state is gathered from its public history, the trend of its laws and the conduct and practice of its public officials, legislative, executive, tion thereof. 32 Cyc. 1251. * * *

"It may be considered by some as questionable or doubtful business policy to lease lands for a long period of time, and then undertake to sell the lands a great number of years prior to the expiration of the lease, but however doubtful or questionable the business policy, or expediency of so doing may be, it does not affect the power and authority of the board to sell.     Both the Constitution and statute authorize the board to lease and sell state lands, but nowhere does either the Constitution or statute prohibit the sale of the fee of lands under lease, and there being no prohibition in either the Constitution or statute, and the power of rental, sale and disposition of state lands being vested in the state board of land commissioners, the courts are without the authority to prohibit a sale, although the land may be at the time leased for a long period of years. This is purely a matter of policy to be determined by the state board of land commissioners, and, if they act unwisely, they must account to the electors of the state, but their judgment and discretion in such matters cannot be controlled by the courts."

We have pointed out the practice of the land office from its very inception (both territorial and state), to insert reservations of minerals in contracts.    A glance at the trend of legislation prior to statehood indicates that the territorial land office was given the same broad power to deal with the subject as was granted to the state land commissioner under the act of 1912, and that those acts were less general in their phraseology when dealing with the subject of power. . We observe that section 3 of chapter 104 of the Acts of 1907, creating a territorial land office, uses the following language :

"The commissioner of public lands shall be provided with an official seal and it shall be his duty to receive and pass upon all applicatons for leasing or purchasing territorial lands and timber, and contracts, grants, rights of way, easements or other rights relating thereto, and execute and authenticate therewith, on behalf of the territory, all leases, deeds, contracts, grants, rights of way, easements and other papers therefor, upon such terms and conditions as he may deem for the best interests of said territory, not in conflict with the terms of this act of Congress under and by virtue of which said lands have been, or may be, acquired.  *   *   *   "

That act was amended by chapter 106 of the Laws of 1909, but the language above quoted was not changed.    The specific words empowering the commissioner to execute contracts, grants, and deeds,

164   SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

"upon such terms and conditions as he may deem for the best interests of said territory," were omitted from the act creating the state land office in 1912, but the general language defining the powers of the commissioner was broadened, and it may not be doubted that the Legislature of 1912, in creating the state land office, intended that the commissioner should exercise the power theretofore reposed in the commissioner of public lands to use his discretion in making deeds, contracts, and grants upon such terms and conditions as he may deem for the best interests of the state.   The fact that the state land commissioner, following the practice of the territorial land commissioner, did, from the time of the execution of the first contract relative to the public lands which was executed by him and continuously thereafter, insert in all such contracts reservations such as the one contained in controversy here, is in itself entitled to consideration by this court.   The contemporaneous construction of the statute, by the executive officer of the government whose duty it is to execute it, is entitled to great respect, and should ordinarily control the construction of the statute by the courts. Pennoyer v. McConnaughy, 140 U. S. 23, 11 S. Ct. 699, 35 L. Ed. 370; Heath v. Wallace, 138 U. S. 582 11 S. Ct. 380, 34 L. Ed. 1067; United States v. Philbrick, 120 U. S. 59, 7 S Ct. 413, 30 L. Ed. 561 (the court saying, "Since it is not clear that the construction was erroneous, it ought not now to be overturned"); United States v. Burlington & M. R. Co., 98 U. S. 341, 25 L. Ed. 200 (this action [construction of statute by land superintendent] is as potential and as conclusive of the soundness of the construction as if it had been declared by judicial decision); United States v. Graham, 110 U. S. 221, 3 S. Ct. 582, 28 L. Ed. 126; United States v. Moore, 95 U. S. 763, 24 L. Ed 589; Brown v. United States, 113 U. S. 571, 5 S. Ct. 648, 28 L. Ed. 1080; Robertson v. Downing, 127 U. S. 613, 8 S. Ct. 1328, 32 L. Ed. 271; Hastings & D. R. Co. v. Whitney, 132 U. S. 366, 10 S. Ct. 112, 33 L. Ed. 367.

JANUARY TERM, 1925          165

State ex rel. Otto v. Field, 31 N. M. 120

In McLarren v. Fleischer, 256 U. S. 477, 41 S. Ct. 577, 65 L. Ed. 1052, the court said:

"In the practical administration of the act the officers of the land department have adopted and given effect to the latter view. They adopted it before the present controversy arose or was thought of, and, except for a departure soon reconsidered and corrected, they have adhered to and followed it ever since. Many outstanding titles are based upon it and much can be said in support of it. If not the only reasonable construction of the act, it is at least an admissible one. It, therefore, comes within the rule that the practical construction given to an act of Congress, fairly susceptible of different constructions by those charged with the duty of executing it is entitled to great respect and, if acted upon for a number of years, will not be disturbed except for cogent reasons."

We think it worth while to observe that this policy of the land department of the state has not been challenged by any of the other departments of the state, nor by the Attorney General of the United States, whose duty it is, by proceedings in the federal courts, to enforce the provisions of the Enabling Act relative to the disposition of said lands and the products thereof. In fact, the Legislature, by chapter 98 of the Acts of 1919, seems to have approved the practice. It is conceded by both parties to this cause that their rights are not controlled by that act, but it may nevertheless be considered for what it is worth as a recognition of the policy theretofore existing in the land department.

In State v. Llewellyn, 23 N. M. 43, 167 P. 144, we considered the course of subsequent legislation, both here and in Arizona, as throwing light on the meaning of certain provisions of the Enabling Act. From that case also we draw several observations as to the construction of statutes of this character, which support our views in this case. The court said:

"'Statutes will be construed in the most beneficial way which their language will permit to prevent absurdity, hardship, or injustice; to favor public convenience, and to oppose all prejudice to public interests.' Sutherland on Statutory Construction, p. 913.

"In construing an act of the General Assembly, such a construction will be placed upon it as will tend to advance the beneficial purposes manifestly within the contemplation of the General Assembly at the time of its passage;

and courts will hesitate to place such a construction upon its terms as will lead to manifestly absurd consequences, and impute to the General Assembly total ignorance of the subject with which it undertook to deal. Sutherland on Statutory Construction, § 490.  *  *  *

"Our construction in this regard is strengthened by another consideration . The Legislatures of both New Mexico and Arizona have treated the rentals of the lands granted and confirmed by the Enabling Act as current funds to be used for the support of the school and institutions for which the grants were made.   Both states have provided for the use thereof annually for such purposes.   The Enabling Acts contain provisions giving to the Attorney General of the United States the right, by proceedings in the federal courts, to restrain any misapplication of such funds, or the diversion therefore from the trust created. No action in this regard has been instituted against either state, evidently because the law officers of the United States do not regard either act as a breach of trust."

From the foregoing consideration of our statutes, we find nothing therein inhibiting the action of the commissioner in reserving the minerals in the contract.

We have discussed these features of the case at such length, because appellee persistently urges that the commissioner of lands attempted to insert a void provision in the contract, and that the appellee could not be estopped from complaining of a void provision.

[3] In this connection, it is urged by appellant that, whatever might be said of the merits of the contentions of appellee respecting his right under an implied contract arising from the application, notice of sale, and sale, and first payment alone, he is bound by his formal written contract, and that, if this contract contains a reservation which is not void, this case must be decided upon the authority of State ex rel. Evans v. Field, 27 N. M. 384, 201 P. 1059. Appellee's strongest argument against this contention is that, the reservation being void, he is not estopped from claiming that the commissioner is bound by the terms of the alleged contract to be inferred from the advertisement of sale, which he says did not adequately advise as to the reservation, the sale, and the acceptance of his bid. We hold that it was not void, although it may not have been what appellee understood would trans-

JANUARY TERM, 1925          167

State ex rel. Otto v. Field, 31 N. M. 120

pire when he made his bid. Entertaining the view
that it was within the power of the commissioner to
reserve the minerals when making a sale of the lands
or any interest therein, we can see no reason why the
general rules of real estate law may not be applied
to the case. The Supreme Court of the United States,
in Wyoming v. United States, supra, is authority for
the statement that that court had repeatedly applied
the rules of real estate law to the administration of the
affairs of the land department of the government.

The Court of Civil Appeals of Texas has said:

"We see no difference in principle between the rules of
construction in ascertaining the legislative intention or the
effect of contracts with the state and those applying to
ascertain the intention of the parties to a private contract."
Carothers v. Mills, 233 S. W. 155.

Looking to such rules of the real estate law, we find
it stated in Maupin on Marketable Title (2d Ed.) § 42:

"The purchaser may reject a conveyance which contains
reservations, restrictions, or conditions, not authorized by
the contract under which the conveyance was drawn. Thus,
under an agreement by which he is to receive a 'good and
sufficient warranty deed,' the purchaser may reject a deed
which reserves an easement in the land to a third person,
though he knew of the existence of the easement at the
time the contract was made"—citing Millinger v. Daly, 56 Pa.
245; 3 Washb. Real Prop. 431 (639).

The same author proceeds in the next section to dis-
cuss waiver of objections, and says:

"The purchaser should make his objections to the deed,
either in respect to form or substance, when tendered. If he
fails in this respect, it has been held that he thereby waives
all objections"—citing Moak v. Bryant, 51 Miss. 569; Dresel v.
Jordan, 104 Mass. 407; Kenniston v. Blakie, 121 Mass. 552;
Bigler v. Morgan, 77 N. Y. 312; Royal v. Dennison, 109 Cal.
558, 42 P. 39; Ellis v. Lockett, 100 Ga. 719, 28 S. E. 452.

Most of the citations we have examined, and find
that they abundantly support the text.

We think that, if the appellee believed at the time
of the sale that he was entitled to a contract and even-
tually a deed without any mineral reservation in it,
the time for him to have urged his claim was when

168 ·     SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

the formal contract, which he had agreed to execute within 30 days after the sale, was presented to him. If his contentions are sound, he could then have demanded a contract without the reservation in it, but, if he did not do so, under the authorities quoted he waived his right to a contract without reservation, if such right existed in him.

Appellant further argues that there were grounds for dealings and negotiations between the appellant and appellee, and that, even though an implied contract might have existed at the time of the sale, all such implied contracts, oral agreements, dealings, and negotiations must be taken to be merged in the formal written contract. Appellee, on the other hand, says that there was no room for negotiation, that the proceedings which the commissioner must follow had been specifically set out in the statutes, and that he had no discretionary power to do anything concerning the lands except where the Legislature had specifically directed him to act in a specified manner—in other words, that the commissioner had no discretionary power. In view of our conclusion that the commissioner did have such power, then whatever may have been the rights of appellee under the advertisement, sale, and acceptance of his bid, differences of opinion concerning the status of the parties would afford a field for negotiation as to the terms of the contract, and the contract, when complete and in writing, would merge all prior and contemporaneous agreements and negotiations within its purview. See Locke v. Murdoch, 20 N. M. 522, 151 P. 298, L. R. A. 1917B, 267.

Appellee relies upon Walpole v. State Board of Land Commissioners, 62 Colo. 554, 163 P. 848, and upon Campbell v. Flying Cattle Co., 25 Ariz. 577, 220 P. 417, which quotes approvingly from the Walpole Case. As these cases were presented upon facts somewhat similar to the case at bar, we will notice them specially.

The Walpole Case was decided upon a Colorado statute which provides, with respect to a sale of public

JANUARY TERM, 1925 · 169

State ex rel. Otto v. Field, 31 N. M. 120

lands, that certain officers were authorized to—

"execute a good and suffficient deed· or patent of conveyance, transferring in fee, without covenants, any and all lands which shall, or may be ordered sold," etc. Rev. St. 1908, § 5167.

Another section of the statute (section 5185) provides:

"Whenever a purchaser of any state land has complied with all the conditions of the sale, and paid all purchase money with the lawful interest thereon, he shall receive a patent for the land purchased; such patent shall be signed by the Governor, attested by the secretary of state, and countersigned by the register, and have the great seal of the state and the seal of the state board of land commissioners thereto attached; and when so signed, such patent shall convey a good and sufficient title in fee simple."

The court then proceeds to consider definitions of the phrases, "in fee" and "in fee simple," and concludes that the board had no authority to sell less than the whole interest in the land. Our statute respecting conveyances in such cases does not describe the nature of the estate to be conveyed, but merely says that, when the purchaser has complied with the terms of his purchase, a deed shall be issued by the land commissioner. In State ex rel. Evans v. Field, we recognize the difference between a deed conveying the land in fee simple and the character of deed the commissioner was willing to make.

In considering the Walpole Case, it is significant that, about 60 days after the decision therein, the General Assembly of Colorado passed what is referred to as the "validating act," which provided that all patents and certificates of purchase on state lands heretofore issued, and in which reservation of rights to minerals, oil, etc., had been made, were thereby validated, provided the holder of such certificates of purchase should by contract, deed, or other agreement, acknowledge or reconvey to the state the minerals and substances so reserved. See chapter 134, Laws of 1917. That statute has not been challenged so far as we know. While we do not hold that our Legislature, by the Act of 1919, supra, validated the acts of the com-

170    SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

missioner, we think that both the New Mexico Legisla-
ture and the Colorado Assembly regarded it within
the purview of legislative action to deal retroactively
with the subject, and that at least we may consider,
as above stated, that the Legislature of New Mexico
found no fault with the policy of the land office with
respect to reservations of minerals when sales of graz-
ing lands were made, but in fact approved of that
policy by providing that state lands, sold theretofore
on the deferred payment plan, under contract contain-
ing a reservation to the state of minerals therein con-
tained, might be leased, and also authorizing the com-
missioner to issue a limited patent containing a reser-
vation of all minerals in the lands.

Further, with respect to the Walpole Case, it should be
noted that the so-called validating act of the Colorado
Assembly, when dealing with the question of the deed
to be made by the Governor upon a compliance by the
purchaser with the terms of the purchase, repealed the
statute which was a basis of the consideration of the
court in the Walpole Case, and enacted in lieu thereof
a new section, which is substantially the same as the
one repealed, except that it omitted from the new en-
actment all reference to the character of the title to be
conveyed, and omitted the words "in fee," which had
been in a former statute, and merely provided that the
Governor should execute a good and sufficient deed.

In Campbell v. Flying V Cattle Co., the Arizona
Supreme Court takes the same view, and bases its de-
cision in part at least upon the decision in the Walpole
Case. We have examined the statutes of Arizona re-
ferred to in the opinion which created the state land
department of Arizona, and conclude that the powers
granted to the commissioner are not as broad as the
powers granted to the commissioner of public lands
of New Mexico. It is also to be noted that in that case
the court, in stating the facts, stated that the question
presented by the record was:

"Whether the state land department may, after a sale of
state land has been consummated by it in the usual course

and without qualification of any character, insert in the cer-
tificate of purchase issued to the purchaser thereof a pro-
vision reserving to the state all the valuable minerals," etc.

In the case at bar, the notice for publication of the
public land sale involving the lands in question stated
that the sale should be subject to certain conditions,
among which was that, if the successful bidder should,
within 30 days after a contract had been mailed to
them by the state and office, execute the same—

"said contracts to provide for the payment of the balance of
the purchase price of said tracts of land in 30 annual install-
ments with interest on all deferred payments at the rate of
4 per cent per annum, in advance payments and interest due
October 1st of each year, and such other conditions, obliga-
tions, reservations, and terms as may be provided by law."

Thus the purchaser was put on notice in the adver-
tisement of sale that reservations might be inserted in
the contract and the purchaser would also be put upon
notice of the nature of these reservations by virtue of
the long-continued practice and policy of the state
land office to reserve the mineral estate in all of its
contracts for the sale of its public lands. It is not ap-
parent, from the facts stated in the Campbell Case,
that any such facts existed in that case, and in fact it
is stated that the sale was consummated without any
qualifications of any character. It will be noted also
that in the Campbell Case the relator was seeking by
mandamus to require the land department to execute a
certificate of purchase free from reservations. Appar-
ently the certificate of purchase in Arizona corre-
sponds somewhat to the formal contract required in
New Mexico to be executed within 30 days after the
contract is prepared. In the present case the appellee
did not challenge the right of the land commissioner
to execute a contract containing the reservation, but
executed the contract without protest, and now seeks
a deed or patent free from the reservations contained
in such contract. In this respect, too, the case at bar
is essentially different from the Arizona case. It is also
noted that paragraph 8 of the instructions to applicants
in the case at bar provides that—

"Any person aggrieved by the commissioner in any matter

affecting the sale of land in which he has an interest, has the right of contest and appeal, as outlined in the Laws of 1912, c. 82."

There is no showing that any effort was made by appellee to avail himself of that provision. There was no attempt made to have the formal written contract reformed so as to speak a situation different from that expressed therein. Appellee makes no showing that he did not execute it knowingly and willingly and gladly, with full information of its contents.

Appellee cites cases to the point that the law is written into the face of the contract, and that the papers and proceedings which are referred to in the formal contract must be taken as a part thereof. We find no fault with these authorities, as we have considered this contract in the light of the Constitution, statutes, rules and regulations, and practice of the land office, and all of the proceedings leading up to the execution of the formal contract. The cases he cites to the proposition that the doctrine of merger does not apply to contracts made by advertisements, bids, and acceptances, are not applicable here, because the law under which the advertisement and bids are authorized require that, in the case of purchase by deferred payment plan, a contract shall be executed. This contract was, according to the advertisement, to contain such terms, conditions, and reservations as the commissioner might lawfully require. How could there be a meeting of minds until there was afforded an opportunity for the commissioner to bring forward such requirments as to his mind were proper and lawful, and the purchaser afforded an opportunity to accept or reject?

We think that the case of Northwestern Lumber Co. v. Grays Harbor Co., 221 F. 807, 137 C. C. A. 365, more applicable to the facts of this case. In that case were negotiations for the sale of certain lands which resulted in a letter accepting an offer made by letter. the letter, however, contained a clause that "a formal agreement shall be entered into, pending actual transfers." The court held that there was no contract until

JANUARY TERM, 1925                    173

State ex rel. Otto v. Field, 31 N. M. 120

the formal written instrument was executed. Many cases are quoted in the opinion, and the court concludes:

"The foregoing cases state no new principle of law, but they are instructive as illustrating how the courts, in dealing with negotiations for a contract, adhere strictly to the requirement that to make a contract the minds of the parties to it must come to an agreement with respect to its essential terms; and when one of such terms in a preliminary agreement to be entered into between the parties, the formal agreement, if it is to contain anything more than mere detail, is necessary to the completion of the contract.   *   *   *"

In some of the cases cited by appellee, one of the considerations which impelled the court to construe the statutes most favorably to the applicant or entryman was that in after years he might be annoyed and suffer a loss through the operations of the owner of an oil or gas lease going upon lands, the surface of which was owned by a previous grantee of the state. For instance, the case of Schendell v. Rogan, 94 Tex. 585, 63 S. W. 1001, a case strongly relied upon by appellee, said:

"The inclosures of those men [referring to the state's grantees] who have settled upon the land would be liable to the intrusion of prospectors and speculators, with the right to dig ditches, sink shafts, and bore wells for the purpose of ascertaining whether or not minerals are contained therein. No provisions are made for protecting the rights of the state's vendees, nor rules regulating the operations of the seeker after minerals, but the unqualified right is given to explore the lands without regard to the rights of others, which shows that it was not intended to apply to lands which the state had sold."

We find, in the oil and gas mining lease in this case, which is dated May 26, 1919, and issued to Howard M. Moore, and which doubtless precipitated the litigation between the appellee and the land commissioner, a clause as follows:

"Lessee shall be liable for all damages to the range, live stock, growing crops, or improvements caused by lessee's operation on said lands. When requested by the lessor, the lessee shall bury pipe lines below plow depth."

This provision in substantially the same terms has been embodied in all oil and gas leases issued by the commissioner from the very first. In view of the policy

already adopted by the land office, we need have no fear that any unjust practices might be followed which would cause material injury to the state's grantees of surface rights only. So that it is our conclusion that the appellee is bound by his written contract dated April 25, 1917.

It follows from the foregoing that the judgment of the court below is erroneous, and should be reversed and the case remanded, with directions to discharge the writ, and it is so ordered.

PARKER, C. J., and WATSON, J., concur.

On Rehearing.

BICKLEY, J. Appellee, by motion for rehearing and brief in support thereof, asks us to give further consideration to the proposition that the action taken by the commissioner of public lands was illegal and void, as being in contravention of the provisions of the Enabling Act, and particularly section 10 thereof. So far as the motion for rehearing is concerned, appellee presents only the federal questions involved in the litigation. The first point relied upon is that the state could not delegate to its commissioner of public lands authority to legislate or to determine the policy of the state in the premises. The argument proceeds upon the theory that the state is not the owner of the lands granted to it by the Enabling Act.

It has been held by this court to the contrary in at least three cases. See Makemson v. Dillon, 24 N. M. 302, 171 P. 673; State ex rel. Evans v. Field, 27 N. M. 384, 201 P. 1059; Neel v. Barker, 27 N. M. 605, 204 P. 205.

It is true, of course, that the grant was impressed with a trust, but this does not detract from the title which the state has in the lands. The Enabling Act provides that a sale or other disposition of the land or natural products thereof, not made in substantial conformity with the provisions of the act, shall be null and void, but it is nowhere said that the lands granted

shall in such cases revert to the government. It is further provided that the terms of the trust agreement relative to the disposition of the lands and the products thereof may be enforced by proceedings at law, cr in equity, to be prosecuted by the Attorney General of the United States, but it is nowhere suggested that the grant itself could be set aside, and, as pointed out in our former opinion, no proceedings have ever been commenced by the United States Attorney General challenging the right of the state to reserve the minerals when disposing of the public lands, although it has been the invariable custom for the territory and state, through its officers intrusted with the administration of such lands, to insert reservations of minerals in contracts and conveyances of its public lands for a quarter of a century. And the fact that no actions have ever been commenced by the federal law officers to restrain such practices is a strong indication that they did not regard such acts as a breach of trust.

Appellee contends that the lands being granted to the state, and in trust, the state occupied the position of the ordinary trustee, and could not delegate any of its powers respecting the policy as to the disposition of said lands, that the Legislature might fix the policy with respect to the retention of the mineral estate in the lands when a sale was made, but that the land commissioner could not. It should be borne in mind that there is a difference between the capacity and mode of the discharge of a trust by a trustee who is a person, and the state, which is a body politic, which must of necessity act through its duly authorized agents and officers. The state is defined as ''a body politic or society of men, united together for the purpose of their mutual safety and advantage by the joint efforts of their combined strength.'' Black's Law Dictionary, citing Cooley's Constitutional Limitations. It must be remembered that it was this society of men who formed and adopted the Constitution which reposed the power in the commissioner of public lands to ''select, locate, classify, and have the direction, control,

care and disposition of all public lands, under the provisions of the acts of Congress relating thereto, and such regulations as may be provided by law."

Says Perry on Trusts, par. 41:

"If a state accepts a trust by grant or bequest, it must act through its legislative powers in administering the trust, or in creating or appointing agents or officers to perform the duties which it assumes, as the United States acted in relation to the bequest of James Smithson in trust for the establishment of the Smithsonian Institution for the increase and diffusion of knowledge among men."

And again at paragraph 409:

"But it must be observed that the appointment of an attorney, proxy, or agent is not necessarily a delegation of the trust. The trustee must act at times through attorneys or agents, and, if he determines in his own mind how to exercise the discretion, and appoints agents or instruments to carry out his determination, he cannot be said to delegate the trust."

The land commissioner and the Legislature got their power from the same source; that is, from the people and their Constitution, and within their respective spheres of duties and responsibilities are of equal dignity. In fact, the Enabling Act seems to contemplate that the land be selected at least by the executive department of the state, and not by the legislative department. As we said in Evans v. Field, supra:

"In order to avail themselves of the grant, the people in their Constitution created the office of commissioner of public lands * * * and clothed him with power to select," etc.

The Constitution, after its preparation by the Constitutional Convention, was considered by Congress, and the general resolution thereof of August 21, 1911, No. 8, was adopted, declaring that New Mexico is admitted to the Union **in accordance with the terms of the Enabling Act.** If any objection had been apparent to the repository of power by the Constitution makers with respect to the public lands, doubtless the Congress would have directed the submission of amendment by blue ballot, as was done in other particulars. It is doubtless true that the Legislature has the power within constitutional limitations to restrict the powers

JANUARY TERM, 1925          177

State ex rel. Otto v. Field, 31 N. M. 120

of the land commissioner, but, as before seen, that executive officer was by the Legislature in 1912 invested with jurisdiction over the public lands, "except as may be otherwise specifically provided by law." When the Legislature and the Congress seem to acquiesce in this repository of power, and no complaint has been manifested by the federal law officers charged with the enforcement of the trust provisions with respect to the manner of using the power, we are constrained to believe that there has been no improper delegation of the trust power, if in fact it can be said to have been delegated. The second point urged by appellee is that the commissioner had no discretion and no power to negotiate subsequent to the sale at public auction. If, as we have said, the commissioner had the power to reserve the minerals when making a sale of the lands, he had the power to proclaim in advance of sale that the formal contract to be entered into within 30 days after notice of the acceptance of the bid should contain reservations of minerals. While the advertisement did not say that in so many words, we are satisfied with our previous holding that the advertisement contains sufficient reference to possible reservations which might be inserted, to put the prospective purchaser on notice that the reservations probably intended were those which by invariable practice had been inserted in similar contracts from the time when the first one was made.

The third point relied upon by appellee is that "the court erred in applying the doctrine of Neel v. Barker, 27 N. M. 605, 204 P. 205, to this case," and argue that the decision was erroneous. It is true a different question was dealt with in Neel v. Barker than that existing in the case at bar. But the conclusion drawn from the efforts of appellee to neutralize the reasoning in that case does not help him any. In support of his contention, appellee, in his brief on motion for rehearing, argues:

"By the use of the word 'land' the Congress of the United States intended to apply the definition contained in Campbell v. Flying V Cattle Co., supra, and, if that were not true,

178     SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

then certainly by the use of the term 'the natural products thereof' minerals are included, because there can be no escape from the conclusion that minerals are a natural product of the land."

As said in the original opinion, we are not able to agree with the appellee that the Congress, by the use of the word "land," intended to apply the definition contained in Campbell v. Flying V. Cattle Co., 25 Ariz. 577, 220 P. 417, as follows:

"Land has * * * 'an indefinite extent, upwards as well as downwards; * * * whatever is in a direct line between the surface of any land and the center of the earth belongs to the owner of the surface. * * * So that the word "land" includes, not only the face of the earth, but everything under it or over it.' "

Now, then, if appellee is correct in his statement that "there can be no escape from the conclusion that minerals are a natural product of the land," which he must maintain in order to persuade that Neel v. Barker is wrong, then he is confronted with the provisions of section 10 of the Enabling Act which do not support his contention that the Congress by that act declared an intention adverse to a severance of the estates in the land.

The Enabling Act does not in terms put any restriction upon the right to dispose of mineral land, except as to manner of advertising and sale (assuming minerals to be included within the meaning of "natural products"). The prohibition against sale of mineral lands is statutory. This we have construed as a prohibition on sale of the mineral content, not the surface. In this construction of our own statute, the Enabling Act is not offended.

The objection under the Enabling Act is that the advertisement did not contain a "full description of the lands to be offered," and that a negotiated contract subsequent to the vendue offends the principle of a sale at auction.

The Enabling Act requires that the advertisement contain a "full description of the lands to be offered." It cannot be maintained that the word

"lands" is all-inclusive, because later in the same section provision is made for the separate sale of "timber or other natural products of such land," and, in referring evidently to what is left after such products have been sold—after a severance of estates, the term "the lands themselves" is employed. Thus, so far as the Enabling Act is concerned, there is no question, but the state is at liberty to dispose of the entire fee, or of the natural products and the "lands themselves" separately, as it may choose.

It was undoubtedly essential to the sale that it be "at a public auction," and to "the highest and best bidder." In that sense, a "negotiated contract" after the auction would be objectionable. If, in fact, the commissioner advertising and receiving bids for the sale of the land or products and striking off the same to the highest and best bidder should afterwards negotiate a different contract than that advertised, so that all bids and bidders were not on the same basis, the objections made by appellee would no doubt lie. But "negotiation" as used in the opinion means only the mode of determining and agreeing upon "such other conditions, obligations, reservations, and terms as may be required by law." It does not mean negotiations to exclude in favor of the successful bidder any such conditions, obligations, reservations, or terms, nor to include in favor of the state any others not "required by law." Holding, as we have, that the mineral reservation inserted in the contract was "required by law" within the meaning of the advertisement, all bidders had or were at least chargeable with the same notice, and contemplated the same contract. There was no violation or evasion of the requirement that the sale be at public auction.

That the "lands themselves" were fully described in the advertisement is not questioned. The objection to the description is merely that the intended mineral reservation is not set forth. But, if reference to it as a reservation "required by law" gave such notice of it as satisfied the requirement of a sale at public

180      SUPREME COURT OF NEW MEXICO

State ex rel. Otto v. Field, 31 N. M. 120

auction, as we hold it did, we think it also satisfies the requirement as to description.

We commend the diligence of counsel, but upon a careful reconsideration are unable to perceive that the acts done in the case by the commissioner of public lands are in violation of any controlling congressional enactment.

The motion for rehearing is denied.

PARKER, C. J., and WATSON, J., concur.