The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:

Filing Date: October 21, 2024

**NO. S-1-SC-39284**

**JOHNSON & JOHNSON and**
**JOHNSON & JOHNSON CONSUMER**
**COMPANIES, INC.,**

Petitioners,

v.

**THE HONORABLE**
**MATTHEW JUSTIN WILSON,**

Respondent,

and

**STATE OF NEW MEXICO ex rel.**
**HECTOR BALDERAS, Attorney General;**
**BAUSCH HEALTH COMPANIES, INC.,**
**f/k/a VALEANT PHARMACEUTICALS**
**INTERNATIONAL, INC.; BAUSCH HEALTH**
**AMERICAS, INC., f/k/a VALEANT**
**PHARMACEUTICALS INTERNATIONAL;**
**and BAUSCH HEALTH US LLC, f/k/a**
**VALEANT PHARMACEUTICALS NORTH AMERICA LLC,**

Real Parties in Interest.

**ORIGINAL PROCEEDING ON PETITION FOR**
**WRIT OF SUPERINTENDING CONTROL**

Bardacke Allison, LLP
Benjamin Allison
Justin W. Miller
Cole P. Wilson
Santa Fe, NM

Skadden, Arps, Slate, Meagher & Flom, LLP
Richard T. Bernardo
New York, NY

for Petitioners

Raúl Torres, Attorney General
Mark W. Allen, Assistant Attorney General

for Respondent

Hector H. Balderas, Attorney General
Brian L. Moore, Assistant Attorney General
Brian McMath, Assistant Attorney General
Santa Fe, NM

Robles, Real & Anaya, P.C.
Marcus J. Rael, Jr.
Albuquerque, NM

Fears Nachawati Law Firm
Majed Nachawati
S. Ann Saucer
Dallas, TX

for Real Party in Interest State of New Mexico
ex rel. Hector H. Balderas, Attorney General

Office of the Governor
Holly Agajanian, Chief General Counsel
Kyle P. Duffy, Deputy General Counsel
Santa Fe, NM

for Amicus Curiae

**OPINION**

**THOMSON, Chief Justice.**

{1}     This case affords us the opportunity to decide a narrow—but important—issue of first impression: whether the New Mexico Office of the Attorney General (Attorney General or OAG), in representing the State in civil litigation brought by the attorney general, has the discovery authority to obtain and produce documents and information from a state executive agency that is not a named party to the litigation. Exercising our original jurisdiction to issue a writ of superintending control under Article VI, Section 3 of the New Mexico Constitution, we answer that question in the affirmative and hold that under New Mexico's governing statutory framework, *see* NMSA 1978, § 8-5-2 (1975), the Attorney General's authority to access executive agency materials for discovery purposes is fairly and necessarily implied and incurs no resulting constitutional violation.

## I.     PROCEDURAL BACKGROUND

{2}     The original action in district court was brought by the Attorney General on behalf of the State, and seeks equitable and injunctive relief, civil penalties, and money damages including restitution against Defendants-Petitioners Johnson & Johnson and Johnson & Johnson Consumer Companies, Inc. (collectively, Petitioners), as well as several affiliate companies. The amended complaint

expressly invokes the State's "sovereign and *parens patriae* authority"[1] in alleging that Petitioners marketed, advertised, and sold talcum powder products in New Mexico despite knowledge that those products contained carcinogens, including asbestos. The State seeks recovery under both common-law and statutory causes of action. These encompass, on the one hand, claims sounding in fraud and negligent misrepresentation; negligence; and unjust enrichment; and also include claims arising under the New Mexico Unfair Practices Act, NMSA 1978, §§ 57-12-1 to -26 (1967, as amended through 2019); the New Mexico Medicaid Fraud Act, NMSA 1978, §§ 30-44-1 to -8 (1989, as amended through 2004); the New Mexico Fraud Against Taxpayers Act, NMSA 1978, §§ 44-9-1 to -14 (2007, as amended through 2015); and the New Mexico False Advertising Act, NMSA 1978, Section 57-15-1 to -10 (1965, as amended through 1967).

{3}    The State's amended complaint references six state executive agencies not named as parties to the litigation. The State alleges these agencies incurred unspecified expenditures due to Petitioners' alleged wrongdoing. The agencies

---

[1]A state's *parens patriae* (literally parent of the country) powers allow it to bring an action on behalf of its citizenry against a defendant whose conduct impacts "'the health and well-being—both physical and economic—of its residents in general.'" *LG Display Co., Ltd. v. Madigan*, 665 F.3d 768, 771 (7th Cir. 2011) (citation omitted).

identified are the New Mexico Human Services Department (HSD)—the agency charged with the administration of the state's Medicaid program—as well as the New Mexico Department of Health, the New Mexico Department of Corrections, the Risk Management Division of the General Services Department, the Retiree Health Care Authority, and the Public Schools Insurance Authority.

{4} In addition to litigation delays attributed to Petitioners' prior bankruptcy stay, the case remains mired in the discovery stage. The parties' exchange of document requests and interrogatories resulted in one main sticking point: a disagreement over the Attorney General's authority to obtain and produce discovery documents and information belonging to the state executive agencies listed in the amended complaint. The Attorney General's response to the discovery request caused a substantial disparity in the parties' respective quantities of documents produced. Petitioners turned over a half million documents—while the State produced only the handful of documents (four to be precise) located in the OAG's files, as well as a single spreadsheet prepared by that office.

{5} This disparity, in turn, led Petitioners to move to compel the production of the materials from agencies not parties to the litigation but named in the complaint. The motion to compel argues that the State—through its Attorney General—having brought "a wide-ranging complaint alleging damages" that include executive agency

expenditures, "must produce documents and information within the possession, custody, or control of those agencies." Opposing the motion, the State asserted that the Attorney General "'has neither possession, custody or control of documents within other branches, agencies, departments, or other entities of State of New Mexico government, nor, unless otherwise advised by the State, the practical ability to get documents from those agencies.'" On that basis, the State sought to relegate Petitioners' agency discovery requests to third-party discovery only. As an apparent fallback position and by way of footnote, the State attempted to distance itself from the inclusion in its amended complaint of any references to executive agencies other than HSD. The State asserted that by that point in time, it "believe[d] that . . . HSD is the only state agency that would have relevant information on damages sustained by the State."

{6}    The district court denied outright Petitioners' motion to compel, concluding that "[t]he state agencies mentioned in the [State's] Amended Complaint, such as the [HSD], are not subject to common executive control nor are they interrelated with the [OAG] and should not be lumped together for discovery purposes" (citing *United States v. Am. Express* Co., 1:10-cv-04496 at 5-7, 2011 WL 13073683 (E.D.N.Y. July 29, 2011), ECF No. 151).

{7}    Petitioners now seek to invoke this Court's original jurisdiction by way of writ of superintending control, requesting that we review—and reverse—the district court's unfavorable discovery ruling. The parties' present submissions reiterate their discovery positions in the district court with minor variations. Specifically, Petitioners argue that the State's discovery obligations extend to its constituent agencies and that, even if that were not so, the State would still be required to produce agency documents and information under New Mexico's liberal discovery standards. The State counters that the discovery relief sought by Petitioners would infringe on separation of powers principles involving the Attorney General and the Governor because "the State, acting through the [OAG], does not have possession, custody, or control of documents or information held by gubernatorially controlled State agencies," in particular any "not a party to the underlying case." In addition, the State echoes its misgivings over its own pleading assertions concerning expenditures made by multiple executive agencies, this time representing that it now seeks compensation for expenditures made solely by HSD.

{8}    For reasons set out herein, we grant the petition for writ of superintending control to review the statutory and separation of powers issues here presented, vacate the district court's discovery order, and remand the matter to the district court with instructions to compel the production of all relevant, responsive, and non-privileged

5

documents and information held by the executive agencies referenced in the State's amended complaint. Our remand is without prejudice to the State's right to file a motion to amend its amended complaint consistent with the multi-agency concerns expressed in its court filings in this case. We do not purport to address the merits of any such motion or, for that matter, of any specific discovery requests.

## II.     DISCUSSION

### A.     This Court's Power of Superintending Control

{9}     "The power of superintending control is the power to control the course of ordinary litigation"—and hence "the authority to regulate pleading, practice, and procedure"—in lower courts. *Dist. Ct. of the Second Jud. Dist. v. McKenna*, 1994-NMSC-102, ¶ 3, 118 N.M. 402, 881 P.2d 1387 (internal quotation marks and citation omitted). This broad and extraordinary power allows the Court both to "offer guidance to lower courts on how to properly apply the law," *State ex rel. Torrez v. Whitaker*, 2018-NMSC-005, ¶ 30, 410 P.3d 201, and "to correct any *specie* of error," *Kerr v. Parsons*, 2016-NMSC-028, ¶ 16, 378 P.3d 1, including any error in the discovery process, *see State ex rel. Brandenburg v. Blackmer*, 2005-NMSC-008, ¶ 7, 137 N.M. 258, 110 P.3d 66 (recognizing that a discovery order, in proper circumstances where "important legal issues" are involved, may be "reviewable as an exercise of superintending control").

{10} The exercise of our superintending control authority, traditionally sparing in use, *see State ex rel. Anaya v. Scarborough*, 1966-NMSC-009, ¶ 8, 75 N.M. 702, 410 P.2d 732, is typically reserved for situations where it is "necessary to prevent irreparable mischief, great, extraordinary, or exceptional hardship, or costly delays and unusual burdens of expense," or to address "an issue of first impression" of constitutional proportion. *State v. Wilson*, 2021-NMSC-022, ¶ 14, 489 P.3d 925 (internal quotation marks and citation omitted). Both criteria are present in this case, which involves important questions surrounding intra-Executive Branch separation of powers—a constitutional "issue of first impression . . . without clear answers under New Mexico law," *Chappell v. Cosgrove*, 1996-NMSC-020, ¶ 6, 121 N.M. 636, 916 P.2d 836—as well as the potential imposition of undue delay, burden, and expense on one party but not the other by way of unilateral third-party discovery.

{11} Given the OAG's stated commitment to pursuing more environmental, consumer protection, and other state-interest civil lawsuits,[2] the statutory and

---

[2]The Attorney General announced a "rebrand[ing]" of the agency's name and logo to the New Mexico Department of Justice (https://www.santafenewmexican.com/news/local_news/attorney-general-rebrands-office-to-new-mexico-department-of-justice/article_ecd45cf6-af0f-11ee-beaf-ab01093741ba.html (last visited 10/16/2024)), the name given to the agency by statute. *See* NMSA 1978, § 8-5-1 (1933). We refer in this opinion to the agency by the statutory name of its "head thereof": Office of the Attorney General or OAG. *Id.*

constitutional issues raised herein are not "passing one[s], and it is reasonable to predict additional future cases may arise. Accordingly, it is in the public interest to settle the question[s] now." *Wilson*, 2021-NMSC-022, ¶ 15 (internal quotation marks, and citation omitted).

**B.      Standard of Review and Relevant Discovery Principles**

{12}      We generally review discovery orders for an abuse of discretion. *Est. of Romero ex rel. Romero v. City of Santa Fe*, 2006-NMSC-028, ¶ 6, 139 N.M. 671, 137 P.3d 611. But we review de novo related questions of law, including issues of statutory and constitutional interpretation. *Id.*

{13}      Effective discovery is essential to the fairness of litigation, as the aim of the discovery process is "to make a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United Nuclear Corp. v. Gen. Atomic Co.*, 1980-NMSC-094, ¶ 54, 96 N.M. 155, 629 P.2d 231 (internal quotation marks and citation omitted); *see Pincheira v. Allstate Ins. Co.*, 2008-NMSC-049, ¶ 21, 144 N.M. 601, 190 P.3d 322 (stating that "the purpose of our discovery rules is to allow liberal pretrial discovery" (emphasis omitted)). Consistent with this liberal discovery policy is the expansive construction the *United Nuclear* Court gave what are now numbered Rules 1-033 and 1-034 NMRA—which govern the use of party discovery in the form, respectively, of

8

interrogatories and document production requests. *United Nuclear*, 1980-NMSC-094, ¶¶ 55-56. This interpretative approach, intended "to insure that a litigant's right to discovery is broad and flexible," *id.* ¶ 54 (internal quotation marks and citation omitted), is guided by two limiting principles: first, a party "cannot be required to produce materials which he is incapable of procuring," and second, a party "should not be required to obtain, collect or turn over materials which the . . . party [seeking discovery] is equally capable of obtaining on its own," *id.* ¶ 57.

{14}    Although each of these principles is ultimately likely to come into play in this case, only the first principle—the ability of the producing party, here the Attorney General acting on behalf of the State to procure agency materials—is directly implicated in our discovery discussion. Under the *United Nuclear* standard, both the requirement of Rule 1-033(A) that the answering party "furnish such information as is available to the party" and the requirement of Rule 1-034(A)(1) that the answering party produce documents or other "tangible things" in its "possession, custody or control" have been distilled down to a single "pragmatic" question: "whether the party from whom the materials are sought has the practical ability to obtain those materials." *United Nuclear*, 1980-NMSC-094, ¶ 58; *see also* 8B Charles Alan Wright, Arthur A. Miller, *Federal Practice and Procedure* § 2210 (3d ed. 2010)

9

(indicating that "control" of materials sought under federal discovery procedures means the legal right or practical ability to obtain them).

{15} Relying largely on federal case law, the *United Nuclear* Court went on to emphasize the following points that, as will be seen, tend to support Petitioners' discovery stance in this case:

> [I]t is immaterial under Rules 33 and 34 [of the New Mexico Rules of Civil Procedure for the District Courts] that the party subject to the discovery orders does not own the documents, or that it did not prepare or direct the production of the documents, or that it does not have actual physical possession of them. It is also clear that the mere fact that the documents are in the possession of an individual or entity which is different or separate from that of the named party is not determinative of the questions of availability or control.

*United Nuclear*, 1980-NMSC-094, ¶ 58 (footnotes omitted).

{16} We highlight an additional factor that helps foster full and meaningful discovery consistent with our liberal discovery rules: the faithful adherence to the principle of mutuality of discovery—the goal that discovery be reciprocal between the parties rather than "a one-way proposition." *See Knight v. Presbyterian Hosp. Ctr.*, 1982-NMCA-125, ¶ 16, 98 N.M. 523, 650 P.2d 45.

**C.** **The Attorney General's Discovery Authority to Obtain and Produce Non-Party Executive Agency Materials in State-Interest Civil Litigation Brought by the Attorney General**

{17} As the party resisting Petitioners' discovery arguments, it is the State's "burden to clarify and explain its objections and to provide support therefor." *United*

10

*Nuclear*, 1980-NMSC-094, ¶ 267 (internal quotation marks and citation omitted); *see Blankenship v. Hearst Corp*., 519 F.2d 418, 429 (9th Cir. 1975) (describing this burden applied to denying discovery sought by the defendants as a "heavy" one). The State's principal discovery objection, that the OAG lacks authority to obtain and produce responsive documents or information in the possession of gubernatorially controlled executive agencies, is ultimately unconvincing given the OAG's role in our constitutional government. *See* § 8-5-2(B) (authorizing the Attorney General to "prosecute and defend . . . all actions and proceedings, civil or criminal, in which the state may be a party or interested when, in his judgment, the interest of the state requires such action or when requested to do so by the governor"). Placing the State's discovery objection in proper context requires an understanding of the "divided executive" structure so prevalent today in state governments across the country and of the differing roles played by the State, the OAG, and other executive agencies in state-interest civil litigation. We begin our analysis addressing these two topics in turn.

**1.      The divided executive branch**

{18}      The hallmark of a divided executive branch is the apportionment of "executive power among different executive officers not subject to gubernatorial control," a dispersal of power that typically features—as is the case in New Mexico—an

11

independently elected attorney general who "does not serve at the will of the Governor." William P. Marshall, *Break Up the Presidency? Governors, State Attorneys General, and Lessons from the Divided Executive*, 115 Yale L.J. 2446, 2448 (2006); *see* N.M. Const. art. V, § 1 (listing five executive officers, including the attorney general, who are elected independently from the governor and lieutenant governor). This fragmented executive framework—long a mainstay of governance in the vast majority of states nationwide—is intended "to weaken the power of a central chief executive and further an intrabranch system of checks and balances." Marshall, *supra*, at 2451; *see also Goldmark v. McKenna*, 259 P.3d 1095, 1101 (Wash. 2011) (en banc) (noting that the founders of the State of Washington intended for its structurally divided executive branch "to have each office act as a check upon the others").

{19} The benefits of an independently elected attorney general who serves as a state's chief legal officer in a divided executive branch were well stated more than half a century ago.

> [A]n elected Attorney General has a measure of independence and a sense of personal and direct responsibility to the public. The elected official has a natural and impelling desire to be creative and to exercise broader initiative in the service of the public. He is free of the fear of dismissal by any superior official if he should exercise contrary independent judgment. He is in the best position to render maximum service to the People and impartial advice to the Governor, the Legislature and State departments and agencies. He can appear in Court

without fear or favor—an attorney in the fullest and finest sense of the word.

Patrick C. McGinley, *Separation of Powers, State Constitutions & the Attorney General: Who Represents the State?* 99 W. Va. L. Rev. 721, 756 (1997) (quoting Louis K. Lefkowitz, *Position Paper of Louis K. Lefkowitz, Attorney General, to Constitutional Convention, Committee on the Executive Branch* (June 1, 1967, Albany, N.Y.)).

{20} Along with the autonomy created by the independent election of most state attorneys general has come a considerable expansion of their duties and responsibilities, which now typically include the "authority to pursue litigation that advances or vindicates public interests." *Pennsylvania v. Mid-Atl. Toyota Distrib., Inc.*, 704 F.2d 125, 131 (4th Cir. 1983) ("In general, a state Attorney General may institute such suits as he deems necessary for . . . the protection of public rights." (omission in original) (internal quotation marks and citation omitted)); *see also State Attorneys General Powers and Responsibilities*, National Association of Attorneys General (NAAG) 247 (Emily Myers, ed., 4th ed. 2018) (observing that state attorneys general regularly "deal with [consumer protection] issues that range from health care to automobiles to privacy, often working together across the states and territories to protect citizens from unfair, misleading, unconscionable, and deceptive acts and practices").

13

{21} It is the Attorney General's exercise of this authority that gives rise to the discovery dispute at hand. The conceptual puzzle at the heart of the dispute "is that no matter how extensive the Attorney General's powers have become, they still must be reconciled with those of the Governor, who, in virtually every state [including New Mexico], enjoys the even more expansive charge of assuring that the laws are faithfully executed." Marshall, *supra*, at 2452-53; *see* N.M. Const. art. V, § 4 ("The supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed.").

{22} Our Legislature has set forth the near-all-encompassing duties assigned to the Attorney General in pursuing state-interest civil litigation, which largely alleviates the above quoted, intra-Executive Branch separation of powers concerns identified by Marshall, *supra*, at 2452-53, and raised by the State herein.

**2. State-interest civil litigation and the respective roles of the Attorney General and state agencies**

{23} As one commentator has noted, the role and function of state attorneys general has "changed considerably" over the years, so much so that they now "occupy an unusual position in state government, with most of them armed with virtually full control over litigation in the name of their state and considerable independence from other institutions in state government." Paul Nolette, *Federalism on Trial: State Attorneys General and National Policymaking in Contemporary America* 18, 20

14

(2015) (tracing this evolution back to the 1980's when the "most consequential efforts" of state attorneys general had gone from "serv[ing] as advocates for the state and its agencies primarily through defensive litigation" to pursuing "offensive litigation in which they represent their states as plaintiffs in increasingly large-scale coordinated litigation campaigns"). Despite this shift in focus and the singular brand of authority and independence that accompanied it, state attorneys general are not typically characterized as party litigants in the lawsuits they bring. *See State ex rel. Norvell v. Credit Bureau of Albuquerque, Inc.*, 1973-NMSC-087, ¶¶ 4-6, 85 N.M. 521, 514 P.2d 40 (concluding that the state is the proper party litigant while the attorney general acts as the state's legal representative in the case), *cited with approval* in *Mid-Atl. Toyota Distrib.*, 704 F.2d at 130-31 (indicating that the several state statutes there at issue in the underlying *parens patriae* damage actions "allocate[] to the attorney[s] general power and authority to *represent* the jurisdiction[s] and [their] interests in [enforcement] litigation" (emphasis added)).

{24}     Labels aside, however, in the context of state-interest civil litigation, a state attorney general is commonly thought of as "assum[ing] the role of a litigant [in] represent[ing] what he perceives to be the interest of the state and the public at large." *Manchin v. Browning*, 296 S.E.2d 909, 918-19 (W. Va. 1982), *overruled on other grounds by State ex rel. Discover Fin. Servs., Inc. v. Nibert*, 744 S.E.2d 625,

15

645 (2013)). Even if the litigation status of a state attorney general in a civil lawsuit is limited to a representative capacity only, it is reasonable to say that the relationship thus created between the attorney general and the state lacks the constraints of the traditional attorney-client relationship given the attorney general's "virtually full control over litigation in the name of the[] state and considerable independence from other institutions in state government." Nolette, *supra*, at 10. This broad authority is clearly provided for in our statute. *See* § 8-5-2(B). In sum, no matter how the OAG's litigation role is styled, it is that office—to the exclusion of all other executive departments and agencies—that controls the substance and conduct of such state-interest civil lawsuits.

{25} As Petitioners correctly argue, however, the discovery questions presented in this case are not ultimately dependent on the party status of the State's executive agencies. We view the non-party status of the various state agencies as being more clear cut and broadly referenced but not denominated as party plaintiffs in the State's amended complaint. The agencies identified in the State's pleading have no direct stake in the underlying lawsuit and can claim at most a tangential financial or fiscal interest in the outcome. We see no sound basis in law or policy to treat such ancillary executive agencies as party plaintiffs for discovery or any other purposes. These agencies, as part of a larger entity of our state government, find themselves

16

implicated in litigation not of their own making and in a forum in which their strategic choices are controlled by the Attorney General. *See State Attorneys General Powers and Responsibilities*, *supra*, at 48 (observing that a state attorney general's authority to represent the state in state-interest civil litigation is designed to "protect[] the interests of the state as a whole as a unitary client, rather than any one of the many potential agency manifestations of the state").

{26} Instead, the issues ultimately hinge on whether the OAG, acting as counsel for the State, had "the practical ability to obtain" the non-party agency documents and information sought by Petitioners. *See United Nuclear*, 1980-NMSC-094, ¶ 58. Guided by the discovery standards this Court reiterated in *United Nuclear* and in light of our ensuing analyses rejecting the core statutory and constitutional issues raised in the petition, we conclude that the OAG had the practical ability to obtain the requested agency documents and information.

**3.    Statutory analysis**

{27} In defining the duties of the OAG, our Legislature has plainly set out a broad range of action that is available to that office in both civil and criminal litigation. *See* § 8-5-2. Central to our analysis here is Section 8-5-2(B), which authorizes the Attorney General to "prosecute and defend . . . all actions and proceedings, civil or criminal, in which the state may be a party or interested when, *in his judgment*, the

17

interest of the state requires such action or when requested to do so by the governor" (emphasis added).[3]

{28} This Court has given proper effect to the broad and expansive terms of the above-quoted provision, affording the Attorney General wide "discretion in determining when the public interest requires him to bring a civil action on behalf of the state," *State ex rel. Bingaman v. Valley Sav. & Loan Ass'n*, 1981-NMSC-108, ¶ 6, 97 N.M. 8, 636 P.2d 279, and, more important for present purposes, recognizing the virtually unfettered control given the Attorney General—as the "chief law officer of the state"—over the conduct of all litigation matters the Attorney General chooses to bring. *See Lyle v. Luna*, 1959-NMSC-042, ¶¶ 23-25, 65 N.M. 429, 338 P.2d 1060

---

[3]It bears mentioning that the defined powers of state attorneys general vary widely across the country in both substance and level of specificity. *See State Attorneys General Powers and Responsibilities* (the 2018 NAAG edition), *supra*, 92-93 & n.4; *see also NAAG, Powers, Duties and Operations of State Attorneys General*, 197-98 (1977) (predecessor of the 2018 NAAG edition) (recognizing New Mexico's prior compilations of Section 8-5-2(B) and NMSA 1978, Section 8-5-3 (1933) as specific among counterpart statutes nationwide). *See State Attorneys General Powers and Responsibilities* 84 (Lynn M. Ross ed., 1990) (printing the full text of Section 8-5-2(A)-(C), (I), (J) and highlighting its specificity). By contrast, for example, the Ohio counterpart statute to Section 8-5-2 does "not clearly define[] . . . [t]he exact extent of the Attorney General's litigation authority," a circumstance which has caused the Sixth Circuit Court of Appeals to "decline to wade into the debate regarding the parameters of [that] authority." *N.E. Ohio Coalition for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).

(internal quotation marks and citation omitted). Indeed, this Court's opinion in *Luna* signaled that, "[i]n the absence of explicit legislative expression to the contrary, the attorney general possesses *entire dominion* over every suit instituted by him in his official capacity whether there is a relator or not." *Id.* ¶ 23 (emphasis added) (internal quotation marks and citation omitted); *accord Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 268 (5th Cir. 1976) ("There is and has been no doubt that the legislature may deprive the attorney general of specific powers; but in the absence of such legislative action, he typically may exercise all such authority as the public interest requires.").

{29}     The State's briefing to this Court—advanced by its Attorney General—readily acknowledges the Attorney General's complete and "exclusive control" over the litigation process in cases commenced by the Attorney General on behalf of the State. In asserting that the Attorney General has the authority to bring actions on behalf of the state but none of the responsibility to produce the discovery materials that support any given set of claims, the State insists that the breadth of the Attorney General's litigation authority does not "extend[] to the power to compel *party* discovery from non-party executive agencies." In so arguing, the State makes much of the absence from the statutory scheme of an express delegation to the Attorney General of that precise authority. In the process, the State through its Attorney

General advances a position that in the end erodes the Attorney General's statutory grant of authority, a bewildering litigation stance considering the aligned interests of the two entities in the context of this lawsuit.

{30}     On the merits, and as discussed below, the State's argument is too restrictive and violates the "ancient" and "well-acknowledged" predicate-act canon of statutory construction, which provides that "whenever a power is given by a statute, everything necessary to making it effectual or requisite to attaining the end is implied." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 30, at 192-93 (2012) (quoting James Kent, *Commentaries on American Law* *464 (Charles M. Barnes ed., 13th ed. 1884)); *see also* 2B Norman J. Singer & J.D. Shambie Singer, *Statutes & Statutory Construction*, § 55:4, at 457-58 (7th ed. 2012) (stating, under the rubric of the "implied powers" rule, that "[a] statute which confers powers or duties in general terms includes by implication all powers and duties incidental and necessary to make the legislation effective").

{31}     As a practical matter, it stands to reason that the broad and exclusive statutory powers conferred upon our Attorney General to initiate and take charge of state-interest civil litigation would necessarily encompass the authority, if not the obligation, to produce responsive documents and information created or possessed by non-party executive agencies. This pragmatic assumption finds support in the

20

reasoning provided by the Connecticut Supreme Court in distinct but related circumstances:

> The Attorney General's responsibility is not [directed] to serving or representing the particular interests of State agencies . . . , but embraces serving or representing the broader interests of the State. . . . It seems to us that if the Attorney General is to have the unqualified role of chief legal officer of the State, he or she must be able to direct the legal affairs of the State *and its agencies.* Only in this way will the Attorney General properly serve the State and the public interest.

*Conn. Comm'n of Special Revenue v. Conn. Freedom of Info. Comm'n*, 387 A.2d 533, 537-38 (Conn. 1978) (emphasis added).

{32}     Significantly, the import of the passage quoted above goes beyond mere pragmatism and has itself recently been identified as an independent basis to compel a state attorney general to obtain and produce documents from non-party, sibling agencies. *See In re Generic Pharms. Pricing Antitrust Litig.*, 699 F. Supp. 3d 352, 358 (E.D. Pa. Oct. 20, 2023) (order) (relying on portions of *Conn. Comm'n of Special Revenue*, 387 A.2d at 537-38, also quoted herein, to conclude that under Connecticut law, the "broad grant" of statutory powers to the state attorney general, including the "general supervision over all legal matters in which the state is an interested party," defeats "the argument that in the prosecution of an action on behalf of the State of Connecticut, the [Attorney General] cannot obtain documents from state agencies" (internal quotation marks omitted)).

21

{33} This same conclusion obtains when we approach the issue from a different perspective. We refer to the aforementioned predicate-act canon of construction, one long recognized in substance, if not in name, in New Mexico. *See State ex rel. Otto v. Field*, 1925-NMSC-019, ¶ 64, 31 N.M. 120, 241 P. 1027 ("In the construction of Constitutions, as well as of statutes, it has often been held that the powers necessary to the exercise of a power clearly granted will be implied." (internal quotation marks and citation omitted)); *see also* Order Granting Petition for Writ of Mandamus, *State ex rel. Madrid v. Turner*, No. 26,035 at 2 (N.M. Dec. 14, 1999) (nonprecedential) ("As a constitutional office within broad statutory powers, including *all powers reasonably and necessarily implied therefrom*, the Attorney General has the responsibility and the power to represent the interests of the State and its officials in all litigation before state and federal courts, and to manage and control said litigation, unless otherwise provided by law." (emphasis added)).

{34} Our reliance on this interpretative canon as a basis to authorize the Attorney General to obtain and produce discovery materials from other executive agencies constitutes a reasonably necessary measure in the circumstances of this case. After all, such an approach dovetails with the OAG's mandatory pre-litigation duty to assess or confirm that a sufficient factual basis exists for believing that there is "good ground to support" a particular cause of action. *See* Rule 1-011(A) NMRA;

*Kropelnicki v. Siegel*, 290 F.3d 118, 131 (2d Cir. 2002) (recognizing that a pleading violates Rule 11 of the Federal Rules of Civil Procedure where, among other criteria, "*after reasonable inquiry*, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact" (emphasis added)). As the Supreme Court of Kentucky said in similar circumstances,

> The power to institute actions must include the ability to inspect and review documents and information relative to a determination of whether a good faith belief exists in order to bring legal action. The power granted by [Kentucky's information-sharing] statute is not limited to that which is expressly conferred but also includes that which is necessary to accomplish the things which are expressly authorized.

*Strong v. Chandler*, 70 S.W.3d 405, 409 (Ky. 2002) (citation omitted).

{35} And assuming the OAG has the practical ability to obtain and review agency materials to fairly evaluate the merits of a case *in its early* stages, as it most assuredly does, then logic and fair play likewise dictate that the OAG would have at its disposal that same capability when it comes to providing meaningful discovery to an adversary in a *pending* case.

{36} Given the laudable degree of specificity built into the provisions of our Section 8-5-2 and the exclusive management and control accorded the Attorney General in the conduct of state-interest civil litigation, there can be little question that the implication to be drawn here—that the Attorney General has the authority to access, review, and produce state agency documents and information—is "a

23

necessary, not a conjectural or argumentative one." Scalia and Garner, *supra* at 193 (footnote, internal quotation marks, and citation omitted).

{37} At bottom, nothing in the plain terms of Section 8-5-2 or our caselaw's reading of those provisions provides support for the State's discovery objection. Nor, as we show next, does the State fare better on the constitutional side of its argument.

**4.     Constitutional analysis**

{38} The State's argument that giving the Attorney General discovery control over state agencies would allow the Governor to interfere with the Attorney General's authority under Section 8-5-2(B) lacks merit because it is based on conflicting premises. While some have supported the notion that allowing the Attorney General to control documents held by independent state agencies could give the Governor or those agencies undue influence over enforcement actions, *see, e.g.*, *Am. Express Co.*, 1:10-cv-04496 at 6, this argument falls apart under closer examination. The State's "virtual veto" theory claims that involving the OAG in discovery targeting non-party executive agencies would jeopardize state-interest civil litigation brought by the Attorney General by encouraging interference from the Governor or the agencies themselves. Yet, at the same time, the State concedes that the OAG has exclusive authority over initiating state-interest civil litigation, which directly contradicts the

State's claim that such authority could be undermined by gubernatorial or agency actions.

{39}    Instructive on this score is *Illinois ex rel. Raoul v. Monsanto Co.*, an unreported but well-reasoned memorandum opinion and order that addressed intra-executive branch separation of powers considerations arising under the Illinois Constitution, which requires "the Illinois Attorney General's Office [to] operate[] independently of the rest of the executive branch, including state agencies (who are controlled by the Illinois Governor)." 1:22-cv-05339 at 4 (N.D. Ill. June 20, 2023), ECF No. 76. The federal district court presiding in *Raoul*, *id.* at 6, rejected as "speculative and generally unpersuasive" a nearly identical "'virtual veto'" argument advanced therein by the state. The court reasoned that it was not clear how granting the defendant's motion to compel

> would (or could) result in the Illinois Governor preventing or obstructing future lawsuits by the Illinois Attorney General. To the extent the Governor does not want the Attorney General to bring a particular action, nothing we decide today affects his ability (or rather, his *inability*) to block such action. . . . Without more explanation, the Court is unpersuaded that granting [the defendant's discovery] motion will stir up constitutional problems between the two state leaders, either now or in the future.

*Id.* at 6-7 (noting the absence of any "Illinois caselaw stating that non-party state agencies cannot be subject to party discovery in cases brought by the Illinois Attorney General under its *parens patriae* authority").

25

{40} As was true in *Raoul*, the State's broad assertions here of a potential intra-Executive Branch conflict fail to carry the day. *See In re Generic Pharms.*, 699 F. Supp. 3d at 357 & n.11 (holding in multi-district litigation that "[g]eneral arguments regarding a possible conflict between the [Attorney General] and the governor of a [s]tate with authority over state agencies are not sufficient" to raise a constitutional question adequate to derail agency document discovery (citing *Raoul*, 1:22-cv-05339 at 7 (addressing separation of power arguments))).

{41} One remaining aspect of the State's virtual veto argument deserves mention: its reflection of a jaundiced judicial view of Executive Branch integrity, a view that ignores the separation of powers-based presumption that at any given time "the executive is acting rationally and in good faith." *State ex rel. Beeler, Schad & Diamond, P.C. v. Burlington Coat Factory Warehouse Corp.*, 860 N.E.2d 423, 429 (Ill. App. Ct. 2006); *see Delahanty v. Commonwealth*, 558 S.W.3d 489, 505 (Ky. Ct. App. 2018) (recognizing "the presumption that public officials, when following statutorily established procedures, are proceeding in good faith and in a proper exercise of the power and discretion reposed in them," and indicating that "specific allegations of overreaching or otherwise impermissible conduct or motives should be addressed as part of particular cases, not through a wholesale attack on the entire

statutory scheme" (text only)[4] (citation omitted)). We have every confidence that our colleagues in the Executive Branch will help facilitate our shared interest in full and fair discovery in cases of all stripes.

{42} We need to emphasize that none of this—neither our statutory nor constitutional analyses—leaves the Governor or an affected executive agency without recourse to a potential legal remedy with the aid of the OAG or its appointed designee if a particular request for agency discovery is deemed to be unreasonable or burdensome, or in the case of the Governor alone, to implicate a valid claim of privilege. *See, e.g.*, *Republican Party of N.M. v. N.M. Tax'n & Revenue Dep't*, 2012-NMSC-026, ¶¶ 43-49, 283 P.3d 853 (announcing that "our jurisprudence supports a limited form of executive privilege derived from the constitution," one "not available to the entire executive branch . . . but instead reserved to the . . . Governor"). All we address here is the State's notion that a *blanket* statutory or constitutional ban on the use of party discovery with respect to non-party executive agencies is somehow required in state-interest civil litigation brought by the Attorney General. And all we hold is that no such ban is warranted or appropriate under New Mexico law.

---

[4]"(Text only)" indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

{43} We also stress that our holding today should not be construed as granting any defendant the broad license to disrupt the vital work of already busy state agencies with what otherwise would be viewed as oppressive or harassing discovery tactics. A defendant's entitlement to party discovery in appropriate circumstances should not be used as an instrument to delay and frustrate the progress of litigation with, say for example, a flood of discovery requests for documents that vary in content and form from the manner and means by which the documents were collected and stored by a given agency. *See* Rule 1-034(B)(1) (providing in part that, "[u]nless the parties otherwise agree, or the court otherwise orders, . . . a party who produces documents for [discovery] inspection shall produce them as they are kept in the usual course of business"); *see* and *compare* NMSA 1978, § 14-2-8(B) (2009) (absolving public bodies of the responsibility to "create a public record" in response to a records request made under New Mexico's Inspection of Public Records Act). Though not necessary to resolve this appeal, we note that it is within the district court's wide discretion in managing pre-trial discovery to prevent in the first instance any such abuses from tainting the discovery process.

**III.   CONCLUSION**

{44} For the foregoing reasons, we grant the petition for writ of superintending control and order the district court to comply with the holding and rationale of this

28

opinion in resolving the parties' discovery dispute. We hereby vacate our previously issued stay, allowing the underlying litigation to proceed, consistent with this opinion, in the district court.

{45}    **IT IS SO ORDERED.**


_____

**DAVID K. THOMSON, Chief Justice**

**WE CONCUR:**


_____

**MICHAEL E. VIGIL, Justice**


_____

**C. SHANNON BACON, Justice**


_____

**JULIE J. VARGAS, Justice**


_____

**BRIANA H. ZAMORA, Justice**

29